**John DOE, et al., Plaintiffs, Appellees,**

v.

**Dr. Gregory ANRIG, Massachusetts Commissioner of Education and the School Committee of Westwood, Defendants, Appellants.**

**No. 81–1807.**

United States Court of Appeals, First Circuit.

Argued April 5, 1982.

Decided Nov. 8, 1982.

---

Diana S. Gondek, Boston, Mass., for the School Committee of Westwood.

Francis X. Bellotti, Atty. Gen., and Linda M. Irvin, Asst. Atty. Gen., Boston, Mass., on brief, for defendants, appellants.

Anne M. Vohl, Burlington, Mass., for plaintiffs, appellees.

Before COFFIN, Chief Judge, FAIRCHILD,[*] Senior Circuit Judge, and CAMPBELL, Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

This case, which involves questions of state and federal law for the education of handicapped children, arises from a dispute over the appropriate educational placement of John Doe,[1] a Down's Syndrome child with special educational needs. The district court set aside an earlier decision of the Massachusetts Department of Education and held that the appropriate placement for John during the 1977–1978 year was in a residential program. We affirm that portion of the district court's judgment. However, insofar as the judgment omitted any award of reimbursement to John's parents for expenses incurred in continuing his prior residential placement during the pendency of administrative and judicial review, we vacate and remand the case for further proceedings consistent with this opinion.

## I. Background

John was born in 1965 and has never lived with his parents. Instead, he has been raised and educated in a series of residential programs. The costs of such care were paid in full by the parents until 1975 when, prompted by the recent enactment of the Education for All Handicapped Children Act (the "Act"), 20 U.S.C. § 1401 et seq., and parallel state law provisions, Massachusetts General Laws ch. 71B, the parents requested school officials to evaluate John and formulate for him an individualized education program ("I.E.P."). Their expectation was that some, if not all, of the costs of John's schooling could be assumed by the public school system. They believed that if education in a residential setting was required, the school committee would be obligated by law to pay for residential care expenses (e.g., room and board), as well as educational costs.

In February 1975, the Westwood, Massachusetts, school committee proposed an I.E.P. which called for placing John in a non-residential public school program, after a transitional year of continued residential placement. The parents rejected this plan, but did not attempt to challenge it through legal channels. Instead, the parents and school officials entered into discussions and reached an agreement whereby John would remain in residential placement, "the parents would assume the Crystal Springs community residence expense for their child and Westwood would assume the costs of the Crystal Springs day school component."[2] At the parents' request,[3] this agreement was submitted to the school committee and approved. Thereafter, the cost-sharing arrangement was described in a letter from a Westwood official to the Massachusetts Department of Education's Regional Office, whose approval was necessary. The letter stated:

"The parents attended a review meeting on 5–29–75 and indicated they would ac-

---

* Of the Seventh Circuit, sitting by designation.

1. The complaint filed in federal district court, which used fictitious names to protect the identities of the parties, alleged that John and Jane Doe were the parents of a child named Joseph Doe. The district court opinion, however, perhaps inadvertently, referred to the child as John, not Joseph, and made no mention of the names of the parents. In an attempt to minimize the confusion, which has persisted at oral argument and in the briefs on appeal, we will follow the usage of the district court.

2. Memorandum from Westwood official to Westwood Superintendent, dated June 5, 1975, Westwood Exhibits, Folder One, § F, p. 72.

3. See Recorder's Notes of Review Meeting, May 29, 1975, Westwood Exhibits, Folder One, § E, pp. 68–69; Letter from Westwood official to Westwood Superintendent, dated June 5, 1975, id. at § F, p. 73; Letter to John's father from Westwood Superintendent, dated June 27, 1975, id. at § F, p. 76.

cept a 'split cost' arrangement wherein Westwood would assume the cost of the Crystal Springs day school but not the residence portion, provided such cost compared reasonably with the 502.4 TEC collaborative program[4] offered in [the] district."[5]

In response, the Office issued a letter on September 4, 1975[6] approving John's placement in a 502.6 prototype (i.e., residential program) at Crystal Springs School, which is where John had lived the preceding eight years. The authorization letter referred to Westwood's letter of July 29, but made no express reference to the cost-sharing agreement.

The parties proceeded to share expenses until the fall of 1977. On September 12, 1977, John's parents requested a full reevaluation of John's status.[7] A complete reassessment was thereafter conducted, and on November 15, 1977, a new I.E.P., for the period covering November 1, 1977 to November 1, 1978, was proposed. The plan contemplated the immediate placement of John in a non-residential program for mentally retarded youngsters at Walpole Junior High School, with later placement in a similar program at Westwood High School. It anticipated that John, for the first time, would live at home with his parents. Because John's parents still strongly felt that residential placement was required, they rejected the 1977 I.E.P., on November 20, 1977.[8] Thereafter, they sought administrative and judicial review in accordance with state and federal law.

The Massachusetts Department of Education's Bureau of Special Education Appeals ("Bureau") ruled the proposed 1977 I.E.P. adequate and appropriate, but found that a transitional program should be developed to facilitate John's move from residential to public school education. That determination was affirmed by the Department's State Advisory Council for Special Education ("S.A.C.")[9].

Subsequently, the parents commenced an action under 20 U.S.C. § 1415(e)(2) to set aside the state administrative decision. They requested that John's appropriate placement be found to be the residential setting at Crystal Springs School, and asked for a declaration of rights and responsibilities with respect to the financial expenses of John's attendance at that school.

The opinion of the district court found that the parents had demonstrated by a preponderance of the evidence that the appropriate placement for John during 1977–1978 was a residential one. It further concluded that the full cost of John's placement at Crystal Springs during 1977–1978 was the responsibility of the public school system, but that there should be no reimbursement for years after 1977–1978 and prior to the decision.

The judgment of the district court, consistent with its opinion, set aside the state determination and stated that the appropriate placement for John in 1977–1978 was the residential program at Crystal Springs. But unlike the opinion, the separately entered judgment was silent on the subject of reimbursement for any year. Apparently

---

4. A 502.4 program refers to a substantially separate educational program generally conducted in public school facilities. It is one of several possible placement prototypes set forth by Massachusetts regulations. *See* 603 C.M.R. 502.0.

5. Westwood Exhibits, Folder One, § F, p. 77, (footnote added).

6. Westwood Exhibits, Folder One, § F, p. 79.

7. Westwood Exhibits, Folder Three, § A, p. 3.

8. Westwood Exhibits, Folder Three, § D, pp. 69, 70.

9. There is some uncertainty as to the exact name of this body. The decision of the district court and the briefs of the parties refer to it as the "State Advisory Council," whereas the decision of that tribunal (Appendix, p. 31), the Department of Education's regulations (*e.g.*, 603 C.M.R. 120.0, Appendix, p. 65), and the state statute (G.L.C. 71 § 3) refer to it as the "State Advisory Commission." We are unaware of any name change which might account for this discrepancy. Inasmuch as it is clear that all parties or writings are referring to the same body, we will simply call it the "S.A.C."

no request was made for the district court to amend its judgment to conform with its opinion.

Both parties have appealed. Defendants argue that the court erred by refusing to grant substantial deference to the decisions of the state administrative bodies, by using an improper standard of "appropriateness" in evaluating the 1977 I.E.P., and by incorrectly weighing the evidence. They seek reversal of the judgment and reinstatement of the decision of the state Department of Education. The parents contend that the district court's placement ruling was correct, but that the court failed to properly allocate the expenses of John's past residential placement. In general, they seek a "ruling" or declaration that they are entitled to reimbursement of expenses they have incurred during the pendency of review.

While the appeal has been pending the parties have continued to adhere to the terms of their cost-sharing arrangement, which appears to have been followed at all times since it was entered into in 1975. The parents' brief states that this division of costs has never been intended to preclude claims for reimbursement upon resolution of the appropriate placement issue. Defendants do not dispute that assertion.

In 1980, John was transferred from Crystal Springs to another residential facility. The district court's opinion noted that "it has been stipulated that that transfer is not at issue."

Neither the district court nor the parties in briefing and argument on appeal had the benefit of *Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Although the Supreme Court confined its analysis to the situation there presented, "a handicapped child who is re-ceiving substantial specialized instruction and related services, and who is performing *above average in the regular classrooms of the public school system,*" —— U.S. at ——, 102 S.Ct. at 3049, the decision contains much concerning the Act that is significant in our quite different case. The *Rowley* Court was facing the question of the extent to which the Act requires fine-tuning of educational programs to provide *equal* opportunities for all students. We are confronting the more elementary dilemma of whether the school board plan would provide the basic services that are necessary for a significantly handicapped child's education. The decision will be frequently cited herein as *Rowley.*

## II. Defendants' Appeal

■ Before considering defendants' challenges to the district court's decision, it seems appropriate to address a preliminary matter. The parties and the district court have uniformly referred to the 1977 I.E.P. and the educational placement of John during the 1977–1978 year. Of course, that period has long since passed, and it would be impossible to change the actual placement retroactively. Nonetheless neither party argues that the case is now moot. Rather, they appear to treat the 1977 I.E.P. —which to our knowledge has never been superseded by a later I.E.P.—as a placement continuing until changed. Such an approach is consistent with the terms of 20 U.S.C. § 1415(e)(3), which provides for continuation of a child's "then current educational placement" during review proceedings under the Act.[10] Under that interpretation, there continues to be a controversy over current placement, as well as over reimbursement for costs in past years. Accordingly, we find no problem of mootness.[11]

---

10. 20 U.S.C. § 1415(e)(3) states:

"During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed."

11. *See Rowley, supra,* —— U.S. at ——, 102 S.Ct. at 3040 n. 9 (district court did not err in reviewing I.E.P. after school year had ended since "alleged deficiencies in the IEP were capable of repetition as to the parties before it yet evading review").

### A. Deference to State Administrative Findings

In relevant part, 20 U.S.C. § 1415(e)(2) provides that a party aggrieved by the findings and decision of a state educational agency with respect to the placement and education of a special needs child:

"shall have the right to bring a civil action ... which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the *preponderance of the evidence,* shall grant such relief as the court determines is appropriate."

(Emphasis added.) The district court interpreted this language as requiring it to determine "*de novo*" whether the 1977 proposed I.E.P. was appropriate for John Doe. The court further noted that:

"while the administrative record is evidence, the administrative decision is entitled to no special deference and this court will make its own independent findings based on the preponderance of all of the evidence presented to it."

Defendants argue that the decisions of the Bureau and S.A.C. should have been viewed as "extremely persuasive" and that the district court erred in discounting their importance.

■ We disagree with defendants insofar as they would limit the district court to the kind of judicial review of agency action contemplated under the Administrative Procedure Act. The statute unambiguously provides that a reviewing court may take cognizance of evidence not before the state educational agency and must base its decision on the preponderance of the evidence before it. As such, the review mechanism which the Act creates stands in sharp contrast to the usual situation where a court is confined to examining the record made before the agency, cf. *Dow Chemical Co. v. Allen,* 672 F.2d 1262, 1267 (7th Cir.1982),

and to determining whether the administrative decision is supported by substantial evidence. Indeed, as this circuit recently noted in an appeal involving this same Act:

"We can imagine many judicial reviews that would uphold an agency decision as based on substantial evidence but that would reach a different result were new evidence to be taken and judged under the more rigorous 'preponderance of the evidence' standard."

*Town of Burlington v. Department of Education,* 655 F.2d 428, 431 (1st Cir.1981).

In *Rowley,* the petitioners argued that under the Act "courts are given only limited authority to review state compliance with the Act's procedural requirements and no power to review the substance of the state program." —— U.S. at ——, 102 S.Ct. at 3050. In response, the Court wrote:

"We find petitioners' contention unpersuasive, for Congress expressly rejected provisions that would have so severely restricted the role of reviewing courts. In substituting the current language of the statute for language that would have made state administrative findings conclusive if supported by substantial evidence, the Conference Committee explained that courts were to make 'independent decision[s] based on a preponderance of the evidence.' S.Conf.Rep. No. 94–455, *supra,* at 50 [*reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 1425, 1503]. See also 121 Cong.Rec. 37416 (1975) (remarks of Sen. Williams)."

—— U.S. at ——, 102 S.Ct. at 3050 (brackets added).

However, while the Act's grant of judicial review authority is therefore broad, the Supreme Court in *Rowley* made clear that "due weight" must be given to state administrative procedures. The Court said:

"[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they re-

view. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to those proceedings. And we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself."

*Id.* at 351 (brackets in original).

■ We do not think the decision of the district court in the present case runs afoul of the principles stated in *Rowley.* Though the district court's statement that the "administrative decision is entitled to no special deference" may seem at odds with the thrust of the *Rowley* requirement that courts give "due weight" to state proceedings, we find nothing in the record before us to suggest that "due weight" was not accorded. In addition, the Supreme Court's concern was with courts "substitut[ing] their own notions of educational *policy* for those of the school authorities." *Id.* at ———, 102 S.Ct. at 3051 (brackets and emphasis added). The difference here between Judge Zobel and the school authorities was not a choice of educational *policy,* but resolution of an individualized *factual* issue as to the effect of John's handicap on his ability to benefit from the proposed school setting.[12] This falls within the scope

of the question which *Rowley* says is for the court: "is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at ———, 102 S.Ct. at 3051.[13] Finally, the Supreme Court's language about limitations on the scope of judicial review must be interpreted in light of the Court's statement that Congress did not intend that "reviewing courts should have a free hand to impose substantive standards of review that cannot be derived from the Act itself." *Id.* at ———, 102 S.Ct. at 3051. Once a court is applying the right substantive standard, as our discussion below indicates we think the district court did here, then there need be no special limitations on *de novo* judicial review.

### B. The Meaning of "Appropriate" Placement

■ The district court's opinion stated: "20 U.S.C. § 1412(1) provides that each state receiving monies under the statute shall provide a 'free appropriate' public education for each child covered by the Act. The term 'appropriate' is not clearly defined. There can be little doubt, however, that in determining the 'appropriate' placement of an individual handicapped child, one must balance the important personal needs of the individual handicapped child, and the realities of limited public monies. *Pinkerton v. Moye,* 509 F.Supp. 107, 112–13 (W.D.Va. 1981); Note, Enforcing the Right to an 'Appropriate' Education: The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103, 1125 (1979)."

---

**12.** Both sides presented the opinions of experts and other evidence in support of their respective positions. No contention was or is made here that the residential placement approved by the court was an option which the state would disapprove on general policy grounds. Indeed, as we note below, residential placement was one of the several approved educational prototypes developed by state educational administrators. Thus the issue was simply whether the nature of John's handicap was such as made residential placement proper in

lieu of the I.E.P. proposed by school authorities.

**13.** *Cf. id.* at ———, 102 S.Ct. at 3038 n. 4 ("Despite ... [the Act's policy] preference for 'mainstreaming' handicapped children—educating them with non-handicapped children—Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children") (brackets added).

Defendants argue that this interpretation of "appropriate" is erroneous and that the error infected the court's decision on the merits of the 1977 I.E.P. Specifically, defendants charge that the court should not have equated educational needs with personal needs. The latter term, defendants imply, is broader than the former and encompasses matters which are not the responsibility of state or local educational agencies under the Act.

We do not think defendants' point is well taken. As is clear from the context, the district court was using the term "important personal needs" as a synonym for "unique needs of a handicapped child," a term expressly employed by the Act to describe those needs which an I.E.P. must address. *See* 20 U.S.C. § 1401(16) and (19). We find no indication that the court placed an expansive reading on the word "personal" or misperceived the nature of the inquiry before it.

In *Rowley,* the Supreme Court found that the statutory definition "appropriate education" "tends toward the cryptic," *id.* at ——, 102 S.Ct. at 3042, and suggested that it might have been better "if Congress had seen fit to provide a more comprehensive statutory definition," *id.* at ——, 102 S.Ct. at 3042 n. 11. Nonetheless, after examining in detail the language of the Act and its legislative history, the Court found it possible to elucidate the meaning of the phrase. It stated in part:

"[A] 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction. Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to per-

mit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined by the Act."

*Id.* at ——, 102 S.Ct. at 3041–3042.

Though the district court did not have the benefit of the Supreme Court's pronouncements on this subject and may have used different terminology, we find no real inconsistency between the standard employed and the principles set forth in *Rowley.*

### C. Preponderance of the Evidence

The district court found that the parents had demonstrated by a preponderance of the evidence that the appropriate placement for John during 1977–1978 was a residential one. Defendants challenge this assessment, and in particular argue that certain factual findings of the court are unsupported by any record evidence. We do not agree, and turn first to the findings specifically contested.

Defendants take issue with the district court's statement that:

"This is a unique case in that John Doe, now in his mid-teens, has been institutionalized since birth. The public school classes which the Westwood school system is recommending for John Doe have no familiarity with such children.... [N]one of the teachers who testified had had any experience teaching children who had never lived in a non-institutional setting."

In disputing these findings, defendants rely on testimony and demonstrative evidence indicating that various teachers had experience working with previously institutionalized children and had familiarity with Down's Syndrome students. This argument misses the point. The court did not find that none of the teachers had experience with children who had been in institutions —indeed, the court's opinion expressly recognizes the contrary. Nor did the court find a lack of experience with children with Down's Syndrome. Rather, the court found that this was a unique case because John had *never* lived outside a residential pro-

gram and none of the teachers had experience with such a child. The portions of the record relied upon by defendants fail to refute that finding.

Defendants also contest the court's finding that Westwood High School teacher Patricia Reardon "had had only one experience with a child who had been brought back to the community after long-term institutional placement" and that that "child had been institutionalized for only six years and had been at home for three years before entering the Westwood class." Quite simply, this finding is based on a fair reading of Ms. Reardon's testimony. Counsel for John's parents asked Ms. Reardon whether she "had any experience with any child who ha[d] been brought back to the community after long-term residential or institutional placement."[14] She replied that she had, that "[t]he youngster was away from the family for at least six years," and that she "did not see him . . . [until] approximately 3 years after he was out of the institution."[15] Her response to counsel mentioned no other experience with children previously in long-term residential care. Defendants fail to cite any portion of the transcript which would indicate otherwise. The court's finding is not clearly erroneous.

■ Turning next to defendants' general challenge to the weight of the evidence, we find it unpersuasive. According to *Rowley*, the question for a court is whether the proposed IEP is reasonably calculated to enable the child to benefit from the instruction. *See id.* at ――, ――, 102 S.Ct. at 3041, 3050. Although the district court did not use the word "benefit" in expressing its finding, we think that it implicitly adhered to the correct standard. In determining that a preponderance of the evidence favored residential placement, the court expressly credited two independent evaluations finding that "[i]t seems likely that [John] might regress when moved to an entirely new home and school environment" pursuant to the proposed IEP, and that

returning John home, which was an integral component of the IEP would "undoubtedly be detrimental for [John]." Crediting this evidence amounted to a finding that John could not benefit from the proposed program of instruction.

Defendants urge that John's parents' unwillingness to have him live at home was a mere familial consideration not germane to whether the 1977 I.E.P. was appropriate for educational purposes. While we agree that the governing consideration is not the needs of the parents, but the needs of the child, the district court could fairly have concluded that forcing John into an unreceptive, perhaps hostile, home environment after an entire lifetime of residential placement, would adversely affect his educational development.

To be sure, there was evidence tending both in favor of and against John's capacity to benefit from the 1977 proposal. The task of weighing the evidence, however, is for the trier of fact, which here was the district court. As a reviewing court we are limited to the question of whether the district court's finding was clearly erroneous. We cannot say, on the present facts, that the evidence favoring the parents' position could not be deemed of greater weight than the evidence favoring the defendants' position.

### III. The Parents' Cross-Appeal

■ The district court's opinion, though not its judgment, stated that the full cost of John's residential placement during 1977–1978 should be paid from public funds. But the court rejected as both moot and without merit the parents' argument that under 20 U.S.C. § 1415(e)(3)'s provision for continuance of "then current education placement" reimbursement was due for each of the post-1977–1978 years during which review of the I.E.P. had been pending. John's parents have appealed as to the reimbursement question and ask this court to clarify the financial implications of the decision

14. Transcript of Hearing, pp. 397–398 (brackets substituted).

15. *Id.* at 398 (brackets added).

that residential placement was appropriate in 1977–1978.[16]

### A. Timeliness and Scope of the Cross-Appeal

Initially, we must address defendants' argument that the parents' notice of appeal was not timely filed.

The judgment of the district court was entered October 6, 1981. Defendants filed their notice of appeal November 5. It was timely inasmuch as it was filed within thirty days of entry of the judgment. *See* F.R.A.P. 4(a)(1). The parents filed their notice of appeal on November 13.[17] This notice was also timely since F.R.A.P. 4(a)(3) provides that if a timely notice of appeal is filed by any party, any other party may file a notice of appeal within fourteen days thereafter.

The parents' notice states that they appeal from the judgment "as to the ruling that the designation by the Massachusetts Department of Education of [John] Doe's individual educational program as 'Prototype 502.6'[18] had no bearing on [John] Doe's legal status or his right to receive the program so designated free of charge." (Brackets and footnote added.) Although the exact contours of the issues thus raised are not readily apparent, we think the parents can be deemed to have appealed from the district court's omission from the judgment of any declaration or award of reimbursement for the share of institutional costs paid by the parents from 1977 to the date of judgment.[19]

### B. The Parents' Right to Reimbursement

#### (1)

In claiming a right to reimbursement, the parents are essentially arguing that since the court belatedly decided in favor of resi-

---

**16.** The papers before us are unclear as to whether the parents are claiming a right to reimbursement for costs incurred between 1975 and 1977. Assuming that they are, we find they have waived any such right by failing to seek administrative or judicial review of the 1975 I.E.P., entering into the cost-sharing agreement with school officials, and willingly adhering to the terms thereof throughout that period.

In arguing that there has not been a waiver of rights, the parents quote a portion of the Amended Pre-Trial Order which states:

"It is further stipulated that the transfer of John Doe from one facility to another during the pendency of these proceedings and any alleged waiver by the parents are not an issue."

(Appendix, p. 190). The import of this statement is unclear. We interpret it to mean only that the parties agreed that there would be no question as to a waiver of rights by reason of the transfer of John to a new facility. *Cf. Stemple v. Board of Education,* 623 F.2d 893, 898 (4th Cir.1980) (right to recover tuition payments held to be waived by parents' unilateral decision to transfer child to a private school during pendency of proceedings). We find no indication that the district court interpreted the statement in the Amended Pre-trial Order otherwise.

We note, moreover, that even in the absence of waiver there would be little chance for reimbursement to the parents for expenses during the period prior to rejection of the 1977 I.E.P. on November 20, 1977. As will be discussed in the text, the arguably-relevant federal law pro-

visions—20 U.S.C. §§ 1415(e)(2) and (e)(3)—have been interpreted as not providing a right to reimbursement except perhaps in exceptional circumstances not present here, and in any event did not take effect until October 1, 1977. The parents do not argue that those sections are retroactive. The state law regulation that we find to be relevant—603 C.M.R. 504.5(f)—provides for reimbursement retroactive to the date an inappropriate I.E.P. is rejected, but only if the rejected I.E.P. is successfully appealed by the parents. John's parents rejected the 1975 I.E.P. but never appealed it through the proper administrative channels.

**17.** The district court docket sheet does not list a notice of appeal as having been filed by the parents. However, such a document is contained in the record and bears a date stamp of the district court clerk's office indicating that it was filed on November 13, 1981.

**18.** Under applicable Massachusetts regulations a 502.6 prototype is a residential educational program. 603 C.M.R. 502.6.

**19.** The language of the parents' notice of appeal was tied, in large measure, to a particular theory which they claim justifies reimbursement. *See* the last paragraph of footnote 20. Nonetheless, we think the notice's reference to a "right to receive the program ... free of charge" was sufficiently broad as to fully raise the reimbursement issue. Indeed, any appeal by the parents would logically have been directed to the reimbursement issue.

dential placement, which John has had throughout, and the total cost of which would have been borne by the public schools had a proper I.E.P. been issued in 1977, the defendants must now reimburse the parents for their expenses in continuing the residential placement during the interim.[20] The federal statutory provision upon which the parents chiefly rely is 20 U.S.C. § 1415(e)(3) which requires that a child shall remain in his "then current educational placement" pending review under the Act.[21] The district court considered the applicability of this section to post-1977–1978 years, and found that it did not provide a basis for reimbursement.[22] We conclude that it has no bearing on reimbursement for any period.

■ Section 1415(e)(3) is designed to preserve the status quo pending resolution of administrative and judicial proceedings un-

der the Act. *See Monahan v. State of Nebraska,* 491 F.Supp. 1074, 1088 (D.Neb. 1980), *aff'd in relevant part,* 645 F.2d 592, 597–598 (8th Cir.1981). It amounts to an automatic stay preventing any change in a child's location and educational program, except by agreement of the parties. The section has been interpreted—correctly, we think—to require that whoever was paying for the placement prior to review shall continue to do so while review is pending. *See id.,* 491 F.Supp. at 1089. But though it bears upon the issues of interim financing, we find no indication that the section was ever intended to govern ultimate rights or obligations with respect to the expenses of placement. Its language does not speak to the question of post-review reimbursement, nor would its purpose of maintaining the status quo during the pendency of proceedings be frustrated by the recognition of such a right. At least one court, faced with

**20.** There appears to be no question, once it has been decided with finality that the appropriate placement is residential, that the cost will be borne by the public.

The relevant federal and Massachusetts statutes reflect a policy that each handicapped child is entitled to a free appropriate public education. *See, e.g.,* 20 U.S.C. § 1412(1). In implementing this policy, state regulation 603 C.M.R. 504.5 provides that where a child is placed in a day school or residential school program at a private school:

"(a) The school committee shall pay to the private school the *full cost* of instruction and support actually rendered or furnished to such child by the private school...."

(Emphasis added.) Clarifying what is meant by "full cost," paragraph 504.5 further states:

"(e) No parents shall be required to bear any part of the cost of the instruction and support actually furnished to their child.... For purposes of this paragraph [504.5], 'the cost of the instruction and support' includes non-medical care and room and board in a residential school program". (Brackets added.)

These provisions support the parents' argument that the total cost of John's placement would have been borne by the public school system had an appropriate I.E.P. been proposed in 1977. We do not understand defendants to argue otherwise.

We note, however, that contrary to an argument advanced by the parents, the above-quoted provisions do not create a right to reimbursement simply by reason of the fact that John attended a residential school during the pendency of administrative and judicial review.

The Department of Education's approval of John's placement of the Crystal Springs School was premised on the existence of the cost-sharing arrangement earlier agreed to by the parents. The Department's letter of September 4, 1975, expressly referred to the Westwood letter of July 27, 1975, which indicated that approval was being sought in light of the cost-sharing agreement.

**21.** The text of 20 U.S.C. § 1415(e)(3) is quoted *supra* at n. 10.

**22.** The district court alternatively found that the § 1415(e)(3) "then current educational placement issue" was moot, apparently based on its construction of its Amended Pre-Trial Order, entered June 1, 1981, which provided in part:

"1. The parties agreed that the only issue to be tried is whether the defendant School Committee will pay the costs of John Doe's schooling if a) the ... [I.E.P.] developed by the School Committee is found not to be appropriate or b) if the I.E.P. is found to be appropriate and the school John Doe has been attending is found to be 'the then current placement.'"

(Appendix, p. 190). Presumably, the court interpreted the Order as requiring it to reach the "then current educational placement" claim only if the I.E.P. was found appropriate. Inasmuch as we agree with the district court's rejection of the § 1415(e)(3) argument on the merits, we find it unnecessary to consider the mootness question.

a claim by parents for damages, including tuition reimbursement, has held that the question could not be resolved on the basis of § 1415(e)(3). *See Anderson v. Thompson,* 658 F.2d 1205, 1209 (7th Cir.1981). The parents fail to cite any contrary decision. We think that at most § 1415(e)(3) entitled John's parents to a continuation of the cost-sharing arrangement during the pendency of review, and indeed that is what they received. The section has no bearing on whether the parents are now entitled to reimbursement for the costs they incurred during that period.

### (2)

In a case such as this, where the key question is whether a court has the power to award reimbursement to parents who under the Act have successfully challenged a proposed I.E.P., it would seem logical for the parties to address the question of whether 20 U.S.C. § 1415(e)(2), which empowers a court to "grant such relief as ... is appropriate," permits a reimbursement award.[23] The litigants before us, however, have not done so.

While the issue has not been decided by this circuit,[24] at least two other circuits—the Seventh and the Eighth—have squarely spoken on the subject. In *Anderson v. Thompson, supra,* 658 F.2d 1205, the Seventh Circuit examined in detail the language, objectives, and legislative history of the Act. It concluded that § 1415(e)(2) was intended in most cases to provide only injunctive relief as a final procedural safeguard that would prospectively ensure an appropriate educational program for a handicapped child. The only possible exceptions that might permit limited reimburse-ment, the court suggested, would be either that the parents have acted to secure alternative services to protect the physical health of the child or that the school officials have acted in bad faith by egregiously failing to comply with the procedural provisions of the Act. More recently, the Eighth Circuit, in *Miener v. Missouri,* 673 F.2d 969 (8th Cir.1982), relied heavily on the Seventh Circuit's analysis in *Anderson* to reach a similar conclusion that an award of damages, including reimbursement, is generally not available under § 1415(e)(2). The Eighth Circuit, however, declined to say whether exceptional circumstances in other cases might render limited damage awards appropriate.[25]

Various district court decisions handed down prior to *Anderson* and *Miener* permitted claims for reimbursement, but often involved facts tending to fall within the exceptional circumstances suggested in *Anderson. See, e.g., Tatro v. Texas,* 516 F.Supp. 968, 977–980 (N.D.Tex.1981) (tuition reimbursement available where child could not be enrolled in defendant's facilities without risk of injury); *Monahan v. State of Nebraska,* 491 F.Supp. 1074, 1094 (D.Neb.1980) (tuition reimbursement available where defendant failed to comply with procedural requirements of Act), *aff'd in part and vacated in part,* 645 F.2d 592, 598 and n. 9 (8th Cir.1981) (court of appeals expressly did not reach question of whether money damages, including tuition reimbursement, are ever available under federal Act); *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104, 1112 (N.D.Cal. 1979) (reimbursement available for private tutor expenses); *Hark v. School District of*

---

**23.** Section 1415(e)(2) is quoted *supra* in Part II–A of the text.

**24.** *Ezratty v. Puerto Rico,* 648 F.2d 770, 776–777 (1st Cir.1981), stated that there are serious questions as to whether § 1415(e)(2) permits an award of reimbursement for education expenditures, but did not decide the issue.

In *Jaworski v. Board of Regents,* 530 F.Supp. 60, 64 (D.R.I.1981), a district court of this circuit, relying in part on the analysis in *Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981) (discussed *infra* in the text), and the concerns ex-

pressed in *Ezratty,* found that the better view is that money damages are not generally available under the Act.

**25.** In contrast to *Anderson* and *Miener,* the Third Circuit stated, on the same day *Anderson* was decided and prior to the ruling in *Miener,* that "[w]hether Section 1415(e)(2) implies a cause of action for monetary relief is an unresolved question." *Tokarcik v. Forest Hills School District,* 665 F.2d 443, 455 n. 22 (3d Cir.1981).

*Philadelphia,* 505 F.Supp. 727 (E.D.Pa.1980) (permitting action for reimbursement to proceed).

■ Thus the present weight of authority holds that 20 U.S.C. § 1415(e)(2) and related portions of the federal statute do not authorize an award of reimbursement in the type of case which is before us. We join this view, and since there is no suggestion that exceptional circumstances were shown in this case, we conclude that plaintiffs have no meritorious claim for reimbursement based on federal law.

Plaintiffs did, however, present to the district court the proposition that Massachusetts law provides for reimbursement in the circumstances of this case.[26] The district court did not address this claim. It has been only briefly mentioned in the parents' brief on appeal, and not at all in the defendants' briefs. Although we do not decide the merits of this state law claim, we think it is worthy of consideration.

(3)

Chapter 71B of the Massachusetts General Laws is entitled "Children with Special Needs," and its provisions parallel and intermesh with those of the federal Act. Section 2 of Chapter 71B directs the Department of Education to promulgate appropriate regulations. Pursuant to that authority, the Department has adopted 603 C.M.R. § 504.5(f), which provides:

"If a child's parent enrolled the child in a Division-approved private day school or residential school program and appealed the child's I.E.P. to the . . . [Bureau] or the . . . [S.A.C.] and the . . . [Bureau] or the . . . [S.A.C.] determines that the IEP developed by the school committee is inadequate and the parent's choice of placement is appropriate, the school committee shall pay the full cost of instruction and support actually rendered or furnished to such child by the private school, retroactive to the date the inadequate IEP was rejected by the parent or could reason-

ably have been expected by the parent. The school committee shall enter into an agreement or contract with the private school, and shall report to the appropriate Regional Branch Office of the Division that the placement has been made."

If in our case the S.A.C. had decided that the I.E.P. was inadequate and the residential placement appropriate, this regulation would appear to require the public school to reimburse the parents for their expenses in the interim.[27] The same result was reached by the Supreme Judicial Court of Massachusetts in *Amherst-Pelham Regional School District v. Department of Education,* 376 Mass. 480, 381 N.E.2d 922 (1978).

In that case, parents whose child had been enrolled in a private residential school requested an evaluation pursuant to the newly-adopted state statute (M.G.L. Ch. 71B) governing the educational rights of special needs children. The evaluation team proposed initial and revised individualized educational plans, both of which called for non-residential placement. The parents rejected the plans, kept their child in the private school, and sought administrative review. The Bureau concluded that the proposed non-residential placement would be inappropriate, that the program in which the child was enrolled was appropriate, and that the public school system was obligated to pay for the child's placement retroactive to the date of the initially rejected plan. Pursuant to state law, the school committee thereafter instituted an action in state court to review the Bureau's decision. The lower court found that the Bureau's findings were supported by the evidence. Following a grant of direct appellate review, the Supreme Judicial Court considered whether the Bureau had the power to award retroactive reimbursement and concluded that:

"retroactive reimbursement to parents who have provided necessary services at their own expense, from the date at

---

26. *See, e.g.,* Appendix, pp. 57–59.

27. We understand the phrase "full cost of instruction and support," as used in subpara-

graph 504.5(f), to include "non-medical care and room and board in a residential school." *See* 504.5(e), quoted *supra* at n. 20.

which they rejected the school committee's inadequate plan, is consistent with the statutory scheme."

381 N.E.2d at 925. The court reasoned as follows:

"If the statutory scheme had worked as intended, the child would have received publicly funded educational services after his parents had accepted the originally proposed plan....

"In this case, the parents chose to reject the proposed plan, in a belief that appropriate services could be provided only in a private residential setting such as the one offered at the Eagle Hill School.... [T]he parents continued the child's placement at the Eagle Hill School. In so doing, they assumed a financial risk that the bureau would recommend a different placement. The bureau's decision, after hearing, however, found the parents' course of action to be correct. In these circumstances, the department policy requiring reimbursement places the parent and child precisely where they would have been had the school committee initially fulfilled its statutory obligations in evaluating the child."

381 N.E.2d at 930–931 (footnote omitted).[28]

An obvious factual difference between the situation dealt with in the Regulation and *Amherst-Pelham,* on the one hand, and our case, on the other, is that in the former a state administrative agency has decided the issue of appropriate placement in favor of the parents. In our case, this decision has been made by a court in a review proceeding prescribed by federal law. Does the state policy expressed in the Regulation and *Amherst-Pelham* extend to the facts of our case?

As we analyze the matter, plaintiffs arguably have presented a state law claim for reimbursement which the federal courts might decide under pendent jurisdiction.

Because the district court has not addressed this issue and the parties have not fully argued it in this court, we remand to the district court for a determination whether state law recognizes a claim for reimbursement and whether plaintiffs have properly asserted this claim under the court's pendent jurisdiction. The district court may, if it sees substance in the possibility of a state claim, wish to consider whether certification to the Supreme Judicial Court of Massachusetts would be appropriate.

Accordingly, we affirm the judgment appealed from insofar as it set aside the decision of the Massachusetts Department of Education and determined that residential placement was appropriate for John Doe. Insofar as it failed to make any declaration or award concerning reimbursement, the judgment is vacated and the cause remanded for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

LEVIN H. CAMPBELL, Circuit Judge (concurring).

Two aspects of the opinion below give me concern, especially in the wake of *Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

1. The district court's phraseology indicating that it would grant "no special deference" to the state proceeding. The thrust of this is hard to square with the *Rowley* "due weight" standard. *Id.* at ——, 102 S.Ct. at 3050.

2. The district court's reference to the child's "important personal needs," which seems to look beyond the Act's requirement of an "appropriate education." 20 U.S.C. § 1412(1).

Yet I believe that the district court reached an acceptable result here and did so even though the standards were not properly articulated. As for the first problem, this matter boils down to a dispute over

---

**28.** 603 C.M.R. § 504.5(f) became effective September 1, 1978. The *Amherst-Pelham* case was argued April 5, 1978 and decided September 28, 1978. The opinion makes no mention of the regulation, but notes that on February 9, 1977, the Department promulgated a "Policy Statement" which took the position that the Bureau had authority to order retroactive payment of private school costs. 381 N.E.2d at 927.

John's individual educational needs. This was a proper matter for the court to decide on the conflicting evidence before it. No issue of broad educational policy is involved. Massachusetts state law clearly provides for residential placements where warranted. *See* Mass.Admin.Code tit. 603, § 502.6 (1979). Unlike the situation in *Rowley,* the court did not reject a state I.E.P. that would have clearly permitted the child to achieve significant educational benefit. Rather the court supportably accepted expert testimony indicating that the child risked retrogression under the state's proposed I.E.P., which involved moving him from a setting of proven value to an entirely new, untested one.

As for the court's reference to "important personal needs," I think in this context that the needs the court actually had in mind can fairly be considered educational. It plainly feared that in a non-residential setting, John would not be able to learn.

Accordingly I agree that the district court's findings should be affirmed.