Daniel ABRAHAMSON, etc.,
Plaintiffs, Appellees,

v.

Corrine HERSHMAN, et al., etc.,
Defendants, Appellants.

No. 82–1201.

United States Court of Appeals,
First Circuit.

Argued Oct. 5, 1982.

Decided Feb. 24, 1983.

Barry L. Mintzer, Boston, Mass., with whom Mintzer, Stibel & Biren, Boston, Mass., was on brief, for defendants, appellants.

Thomas A. Mela, Boston, Mass., with whom Barbara B. Clurman, Boston, Mass., was on brief, for plaintiffs, appellees.

Before PECK,[*] Senior Circuit Judge, CAMPBELL and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Daniel Abrahamson is a severely retarded 16-year-old child whose parents have brought a civil action in the United States District Court for the District of Massachusetts under the authority of the Education for All Handicapped Children Act of 1975 (the Act), 20 U.S.C. § 1401 et seq. (1978). The Abrahamsons challenge the individualized educational plan (IEP)[1] which Daniel's local school board, in Sharon, Massachusetts, proposes for him and which was upheld as sufficient by various Massachusetts reviewing agencies. Instead of day school training only, Daniel's parents seek a residential placement for him. The district court ruled that Daniel's right to a "free appropriate public education" within the meaning of the Act would not be met by the proposed IEP and ordered a residential placement. The Sharon School Committee (hereinafter Sharon), which bears the primary financial responsibility for any program provided to Daniel, has appealed.[2]

I.

The district court found that Daniel has the mentality of a one- to four-year old, cannot dress, eat, go to the bathroom or otherwise care for himself unaided, and except for uttering one or two sounds, which he probably does not understand, cannot speak. He sometimes responds to simple commands like "stop," "wait," "sit down," and "stand up," but his responses are erratic and unpredictable. He does not recognize danger to himself and may step in front of traffic, move through open windows, or be burned while investigating a stove. He exhibits compulsive running behavior, although this has somewhat diminished recently. The district court ended its description of Daniel as follows:

Running is only one of many types of conduct that significantly interfere with Daniel's ability to learn. His behavior, past and present, is replete with examples that, taken together, indicate a lifelong pattern of engaging in what has been described as "manipulative attention-seeking behavior." This pattern of behavior, combined with Daniel's history of exhibiting ritualistic behavior such as obsessive sorting and stacking, supports the characterization of Daniel's mechanisms for coping as "autistic-like." These serious emotional problems, Daniel's severe mental retardation, and his educational disorders in combination make Daniel a truly "atypical child" for whom learning is extraordinarily difficult.

(Footnotes omitted.)

Daniel's medical history began in 1969, when he entered a preschool day clinic. Thereafter he attended a number of day programs until May 1975, when he entered a private residential program at the Crystal Springs School in Assonet, Massachusetts. At this time, the district court found Daniel was making little educational progress in the day program: he would not respond to his name, did not seem to understand anything at all, and had to be locked into the classroom to prevent him from running off. The March 29, 1975 IEP providing for Daniel's transfer to the program at Crystal Springs described Daniel's educational needs as follows:

[*] Of the Sixth Circuit, sitting by designation.

1. Under 20 U.S.C. §§ 1401(18) & (19) (1978) and Mass.Gen.Laws ch. 71B § 3 (1982), school authorities must annually formulate an IEP outlining the educational goals and services that will be provided for the year for each handicapped child.

2. Massachusetts places responsibility for the education of handicapped children on local school boards, although some reimbursement is provided for by the state. See Mass.Gen.Laws ch. 71B et seq.

a residential placement in an intensive, constantly maintained and individually designed program involving immediate and sustained rewards for acceptable behavior using accepted and proven techniques with the necessary staff to support an expectation of success in the establishment of basic self-help skills and academic readiness. This program should continue until such time as the skills he has acquired enable him to function in as normal a setting as possible.

Despite the satisfactory progress Daniel was making at Crystal Springs, his stay there turned out to be brief because the school was unable to ensure his safety given his running away problem. After being discharged from the Crystal Springs residential program in November 1975, Daniel temporarily attended the Crystal Springs day program until a suitable residential placement could be located. In August 1976 he was placed in accordance with the March 1975 IEP at the Spear Educational Center in Framingham, Massachusetts.

At Spear, a strict behavioral modification approach was to be used in teaching Daniel such basic skills as toileting, motor integration, expressive and receptive communication, and the ability to recognize danger. He was to receive training both day and night, with the evening "residential component" designed to reinforce what was learned during the day. Due to institutional problems, such as lack of adequate staff, however, Spear's program was unable to meet its goals for Daniel. In September 1980 Spear lost its license and at the request of the Massachusetts Department of Education (DOE), its facilities were taken over by Efficacy Research Institute (ERI). Daniel has remained at ERI throughout this litigation.

In August 1979 Sharon presented Daniel's parents with an IEP for Daniel that called for him to be placed in a special day program in the public school run by the CHARMSS collaborative.[3] The IEP provided no other plans for Daniel's education, although the director of CHARMSS told Daniel's parents that he would only be accepted in CHARMSS if a residential component could be found to supplement the day program.

Daniel's parents rejected the proposed IEP and appealed to the Massachusetts Bureau of Special Education Appeals (BSEA). The BSEA hearing officer found that Spear was an inadequate placement and that CHARMSS would provide Daniel with an appropriate education. The officer also found that Daniel required residential care, but decided that such needs were not "educational" in nature and therefore not the responsibility of the Sharon School Committee to offer. The hearing officer referred the case to the Central Interdepartmental Team, a committee representing several Massachusetts agencies serving children.[4] The committee was unable to reach an agreement as to which agency was responsible for providing Daniel with residential care.

Daniel's parents appealed the BSEA decision to the State Advisory Commission (SAC), an administrative board within the DOE. SAC reaffirmed the BSEA decision but also ordered that Daniel be kept at his current placement pending further appeal.

The Abrahamsons then appealed the BSEA decision to the district court under 20 U.S.C. § 1415(e)(2). Sharon filed a cross-complaint against DOE's order that Sharon fund Daniel's residential placement pending appeal. On January 29, 1981 the district court issued a preliminary injunction requiring Sharon to continue paying for the placement. On February 1, 1981, the district court remanded the case to the BSEA for reconsideration in light of the interim decertification of Spear and its replacement, at the request of DOE, by ERI. On

---

3. CHARMSS is run by a consortium of Massachusetts school committees.

4. The DOE claimed that Daniel's residential needs should be provided for by the Massachusetts Department of Mental Health (DMH).

The Department of Mental Health, whose programs are not available to all eligible residents, argued that the DOE was responsible for Daniel's residential care.

remand the hearing officer reaffirmed his earlier decision.

After the BSEA rendered its second opinion, the district court took additional evidence, hearing two experts who had not testified before the agency. On January 22, 1982 the district court issued an opinion and order. The court stated that,

> The dispute in this case is not over whether CHARMSS offers an adequate day program, but rather over whether Daniel must be provided with more continual instruction and reinforcement than can be furnished in a school day in order to make educational progress.

The court reviewed the evidence and noted that Dr. Paul Touchette, an eminent education psychologist who had observed Daniel for approximately six to seven months, found that Daniel was an unusual child who needed "greater continuity and consistency of approach than is available in a day program." Dr. Touchette stated that Daniel needed round-the-clock attention in order to catch up and that Daniel's earlier placement in day programs had hurt him educationally. The district court also found that Dr. Schell, a clinical child psychologist, testified that Daniel needed a 24-hour educational program "in order to avoid regression and benefit from his training." The court additionally noted that Mr. Spague, the director of CHARMSS, affirmed that he had written to the Abrahamsons that Daniel would only be accepted at CHARMSS if a residential placement could be found because Daniel needed consistency and continuity in training in order to reinforce the skills he would be taught at CHARMSS.

On the basis of this evidence, the district court found that

> [Daniel] requires a greater degree of continuity and consistency in approach and programming than can be provided ... at CHARMSS alone. If Daniel is to ben-

efit from the strict behavior modification educational instruction he receives during the day, he must have qualified and competent people applying these behavior modification techniques and reinforcing during the evening hours the things he has been taught during the day. He requires a highly structured environment in order to learn. ... [I]f this unusual child is placed in the ... CHARMSS day program, without an accompanying "residential" component in which trained staff follow through in a highly coordinated fashion with the educational training he has received in the day program, Daniel will not only fail to make educational progress; he will also very likely suffer regression.

The court found further that Daniel "would make satisfactory progress" if he were enrolled in either his current placement in the residential program at ERI or in a day program such as the one at CHARMSS along with a residential placement providing "consistent instruction ... and continual reinforcement." The court then ordered that Daniel be kept at ERI unless he was placed in CHARMSS and a group home providing training. It is from this order that Sharon appeals.[5]

## II.

■ The central question before us is whether or not the district court erred in finding that the IEP proposed by Sharon failed to afford Daniel with a "free appropriate public education" as defined by the Act because Daniel required some form of residential care in order to achieve educational progress.[6] In analyzing that question we are guided by the Supreme Court's decision in *Board of Education v. Rowley*, —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

In *Rowley* the Supreme Court considered the meaning of the term "free appropriate

---

**5.** The DOE, technically an appellee, joins with Sharon in challenging the district court's order.

**6.** A preliminary matter concerns the fact that the IEP at issue was for the 1979–80 school year, which has long since passed. Nevertheless, as we decided in *Doe v. Anrig*, 692 F.2d

800, 804 (1st Cir.1982), this case is not moot. The 1979 IEP, to our knowledge, has not been superseded, and may be treated as being in effect until changed. *Id.;* 20 U.S.C. § 1415(e)(3).

public education." The court found that while Congress had not clearly defined the term,

> Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have a handicapped child receive no benefit from that education.

*Id.* at ——, 102 S.Ct. at 3048. At the same time, the Court rejected the argument proposed by the district court that the Act required schools to provide services that would enable handicapped children to achieve their "full potential commensurate with the opportunity provided other children." 483 F.Supp. 536 (S.D.N.Y.), *aff'd,* 632 F.2d 945 (2d Cir.1980). The Court found that "the language of the statute contains no requirement like the one imposed by the lower courts—that states maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.'" —— U.S. at ——, 102 S.Ct. at 3042.

It follows from *Rowley* that the Act does not authorize residential care merely to enhance *an otherwise sufficient* day program. A handicapped child who would make educational progress in a day program would not be entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential. A school committee is required by the Act merely to ensure that the child be placed in a program that provides opportunity for some educational progress.[7]

In the instant case, however, the district court did not order residential care in order to maximize Daniel's potential. Rather the court found that educational benefits which could only be provided through residential care were essential if Daniel was to make *any* educational progress at all. Daniel's unique condition was found to demand that he receive round-the-clock training and reinforcement. Given the evidence before the district court, *see supra,* we cannot say that this conclusion was clearly erroneous. *Doe v. Anrig,* 692 F.2d 800, 808 (1st Cir.1982).

To be sure, the Act does not authorize a residential as opposed to a day school placement in so many words. However, it requires states to provide to handicapped children at no cost to their parents, "special education," and this term is defined to include "home instruction, and instruction in hospitals and institutions." 20 U.S.C. §§ 1401(16); 1401(18); 1412. Regulations promulgated by the Secretary of the Department of Education pursuant to authority conferred by the Act, 20 U.S.C. § 1417(b), provide that

> If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child the program, including non-medical care and room and board, must be at no cost to the parents of the child.

34 C.F.R. § 300.302. We thus believe that the district court had ample authority under the Act, as construed by the Secretary, to order Daniel's placement in a suitable residential program upon finding that a residential placement was essential if Daniel was to receive the round-the-clock training he needed in order to make *any* educational progress. *Doe v. Anrig,* 692 F.2d at 808. Additionally, we observe that Massachusetts law itself makes specific provision for placement of handicapped children in residential schools. Mass.Gen.Laws ch. 71B, §§ 2(8), 5A.

This is not to say that the Act requires a local school committee to support a handicapped child in a residential program simply to remedy a poor home setting or to make up for some other deficit not covered by the Act. It is not the responsibility of local

---

7. Placing a child in a residential program when that is unnecessary for enabling the child to make educational progress may also violate the Act's mainstreaming provisions, 20 U.S.C. § 1412(5), *see infra.*

officials under the Act to finance foster care as such: other resources must be looked to. In passing the Act, Congress intended to remedy the fact that educational systems often failed to provide programs for handicapped children with the result that many received either an inadequate education or none at all. Congress did not intend to burden local school committees with providing all social services to all handicapped children. Here, however, the court ordered residential care only upon finding that the minimal educational benefits to which Daniel was entitled could not be obtained in a day program alone; rather the kind of training he needed had to be given round-the-clock, thus necessitating placement in a residential facility.

Sharon argues that Daniel's needs for residential care should not be considered educational because much of what will be provided him in a residential program will resemble custodial care. The district court found, however, that Daniel would not merely receive custodial care in a residential placement, but would receive training and reinforcement there that was essential in order for him to make any educational progress whatever. To be sure, what Daniel will be taught in a residential program, as well as in the CHARMSS day program,[8] will concern skills of daily life, subjects that are not normally covered in ordinary curriculums. But, it is hard to disagree with the Third Circuit's statement that "the concept of education is necessarily broad with respect to" some severely or profoundly retarded children. *Kruelle v. New Castle Country School District,* 642 F.2d 687, 693 (3d Cir.1981); *see also North v. District of Columbia Board of Education,* 471 F.Supp. 136 (D.D.C.1979). Where what is being taught is how to pay attention, talk, respond to words of warning, and dress and feed oneself, it is reasonable to find that a suitably staffed and structured residential environment providing continual training and reinforcement in those skills serves an educational service for someone like Daniel. 642 F.2d at 694. Congress established a

priority under the Act for the most severely retarded children, 20 U.S.C. § 1412(3), for many of whom, certainly, education will not consist of classroom training but rather training in very basic skills. Because the district court found that the CHARMSS program alone would not offer Daniel that type of reinforcement which the court found essential to his educational progress, and that Daniel *would* make educational progress if he were given round-the-clock training, the district court was entitled to find that the IEP proposed by Sharon failed to offer Daniel a free appropriate education.

### III.

■ Sharon challenges the right of the district court to order—as an alternative to his continuing to attend ERI—that Daniel be given a "residential placement, which may be in a community group home ..." in conjunction with being placed at CHARMSS. Sharon claims that the Act does not contemplate the placement of handicapped children in a group or foster home. The central thrust of this argument—that the services Daniel will receive in such a placement are not educational in nature—has been partly answered above. In addition, we note that the court did not authorize Daniel to be placed in *any* group home. Only a group home "providing a structured environment ... in which he is given consistent instruction in and continual reinforcement of the skills he is taught in the [CHARMSS] program" was authorized. The court was obviously seeking to allow Sharon to utilize a less costly alternative than a residential school so long as it could provide comparable educational benefits.

Sharon rightly points out that the Act does not specifically provide for a child's placement in a group home. As already pointed out, however, the Act, the Secretary's regulations, and Massachusetts statutory law contemplate the possibility of residential education where the unique needs of

---

**8.** The district court noted that even the IEP proposed by Sharon stated its educational goals for Daniel as improvements in activities of daily living.

the handicapped child necessitate it. The Act also clearly provides for home instruction, 20 U.S.C. § 1401(16), and as the court discovered in *Association for Retarded Citizens of North Dakota v. Olson,* Civ. No. A1–80–141 (D.N.D. Aug. 31, 1982), it is almost impossible to make a clear distinction between institutional and foster home care. Institutions and group homes share a variety of characteristics; group homes and home care share others. *Id.* To attempt a sharp distinction between institutions and home care and thereby exclude community homes which share characteristics of both would make little sense. Such a distinction would only make it impossible to select less costly placements in lieu of institutional ones.[9] Where, as here, a group home must be selected to meet specific education criteria, we see no basis for excluding it from the choices open to education officials and courts.

This is not to say that group homes supplementing day programs are an alternative which states *must* provide. Congress largely left it to the states to determine educational policy. *See* Note, *Enforcing the Right to an "Appropriate Education: The Education for All Handicapped Children Act of 1975,"* 92 Harv.L.Rev. 1103, 1109 (1979). The only substantive limitations Congress placed on the states were the requirements that the policy chosen provide the handicapped child with some educational benefit, *Rowley,* and conform to the Act's mainstreaming requirements. *See infra.* We hold only that the district court was acting within its authority in these circumstances in authorizing the CHARMSS-group home option.

### IV.

Sharon asks us to rule that the CHARMSS-group home placement would be the "least restrictive environment" for Daniel among the alternatives listed in the court's order, and is therefore the mandated choice under the Act's mainstreaming provisions. 20 U.S.C. § 1412(5). The short answer to this contention is that the district court's order gives Sharon the option to place Daniel in a group home. Thus absent some dispute over the implementation of the court's order, the issue we are asked to rule upon is purely hypothetical.

Moreover, even assuming that the mainstreaming provisions would have some impact here,[10] it would be impossible at this time—when a potential group home has not even been identified—to determine whether placement in such a home is to be preferred.

---

9. Sharon also argues that group homes do not fall within the Act because Congress intended one agency to administer all services provided for by the Act, and in Massachusetts the DMH rather than the DOE licenses group homes. We do not find this argument persuasive. While Congress left state departments of education ultimately responsible for the carrying out of the provisions of the Act, 20 U.S.C. § 1412(6), Congress did not require state agencies to be the provider of all services. Indeed, the legislative history supports the opposite conclusion. The Senate Report on the Act stated the Act "is not to be construed to prohibit charges by the educational agency to insurers, public programs, and others for hospital care, health services, rehabilitation, and other non-educational services. States are encouraged to utilize all sources of support for comprehensive services for handicapped students." S.Rep. No. 168, 94th Cong., 1st Sess. 1, *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1456.

10. 20 U.S.C. § 1415(5) requires states to establish

procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate school, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

On its face, the statute is inapplicable here. All parties agree that Daniel cannot be educated in regular classes. Nevertheless, Department of Education regulations interpret the statute as requiring state agencies to "insure that a continuum of alternative placements is available to meet the needs of handicapped children." 34 C.F.R. § 300.551. The continuum required by the regulations distinguish between special classes within regular schools and special schools, indicating that the former is preferential in terms of mainstreaming. 34 C.F.R. § 300.442.

Under the regulations, the decision as to which placement is appropriate for a child, is primarily an individualized one. 34 C.F.R. § 300.552 Comment. The placement is not to be made by mechanically choosing the least restrictive environment; rather, the decision must consider the child's own needs, and the location of the programs available.[11]

## V.

■ Sharon also argues that the district court erred in finding ERI to be an appropriate placement. The School Committee claims that Daniel would not benefit educationally at ERI because the school was plagued with a high rate of staff turnover, and lacked qualified speech teachers.

There is some evidence in the record to support Sharon's claim. But, there is also ample evidence to support the district court's finding. Dr. Paul Touchette, testified that he observed Daniel making educational progress at ERI. The record further showed that Daniel was not yet in a position to benefit from speech therapy, and that what he required was training aimed at increasing his attention span, so that he could begin to learn other skills, including speech. Evidence also indicated that ERI's high staff turnover was in part due to the recent takeover from Spear, that the high turnover rate was not expected to continue, and that it was not unduly disruptive to the school's educational program.

In *Doe v. Anrig,* we stated that "The task of weighing the evidence, however, is for the trier of fact, which here was the district court. As a reviewing court we are limited to the question of whether the district court's finding was clearly erroneous." 692 F.2d at 808. Given this record, we cannot make such a finding.

## VI.

■ Both Sharon and the Massachusetts DOE argue that the district court failed to give "due weight" to the BSEA. We disa-

gree. The district court here showed considerable respect for the state agency. The court initially remanded the case to the BSEA for the agency's reconsideration of its decision in light of the decertification of Spear. And, more importantly, the district court's remedy demonstrates significant respect for state authorities. Having determined that Daniel requires residential care, the court proceeded to formulate an order that left state authorities with substantial discretion. The order permits Sharon to fund Daniel's placement either at ERI or at a group home and CHARMSS. Thus the court left the state and local officials with leeway to select Daniel's specific educational program and determine whether a residential school or a group home combined with a public school program best satisfied their educational objectives and fiscal concerns.

To be sure, the district court did not reach the same result as did the BSEA. But, as the Supreme Court noted in *Rowley,* while courts must give "due weight" to state administrative agencies and "be careful to avoid imposing their view of preferable educational methods upon the States," ⸺ U.S. at ⸺, 102 S.Ct. at 3051, courts ultimately must make "independent decision[s] based on a preponderance of the evidence." *Id.* at ⸺, 102 S.Ct. at 3050, *quoting* S.Conf. No. 94–455 *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425.

Here, the district court's disagreements with the state agency were twofold. First, the district court found that ERI was an appropriate placement for Daniel. Insofar as that conclusion stemmed from the district court's finding that Daniel could learn in ERI and that the school had adequate facilities for Daniel, the decision was purely factual. The court did not disagree with the state over educational policy, merely over whether the state-licensed program at ERI would serve Daniel's own particular needs. Such an issue fell clearly within the scope of the question that *Rowley* left to the courts. *Doe v. Anrig,* 692 F.2d at 806.

---

**11.** Programs located close to the child's home are apparently favored. 34 C.F.R. § 300.-552(a)(3).

The district court also disagreed with the BSEA over whether Daniel's undisputed need for residential care should be characterized as "educational" under the Act. Both the BSEA and the court were in agreement that Daniel required a residential placement. They disagreed, however, as to whether this service fell within the term "educational," thus imposing an obligation upon Sharon to fund the placement. As we have discussed above, *see* section II, *supra,* we think that the district court supportably construed Daniel's need for a residential placement as "educational" within the meaning of the Act. And in so doing we find no lack of due deference to the state, even though the BSEA held to a contrary opinion. The construction of a statutory term traditionally falls within the scope of judicial review. K. Davis, *Administrative Law Treatise* § 29.00–6 (1982 Supp.). Of course, courts normally grant administrative agencies substantial deference in this regard, *id.,* and significant respect to state agency interpretation is warranted under the Act, which is envisioned as an example of "cooperative federation."[12] *Rowley,* —— U.S. at ——, 102 S.Ct. at 3037–38; *Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). Thus, it might be inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state. Nevertheless, for judicial review to have any meaning, beyond a mere review of state procedures, the courts must be free to construe the term "educational" so as to insure, at least, that the state IEP provides the hope of educational benefit. *See Rowley,* —— U.S. at ——, 102 S.Ct. at 3048–49; *Battle,* 629 F.2d at 284 (Sloviter, J., concurring). The district court's decision is entirely consistent, moreover, with Massachusetts legislation authorizing residential placements for the handicapped. Mass.Gen. Laws ch. 71B § 2. We therefore find that

the district court did not fail to give appropriate respect to state and local authorities.

*Affirmed.*

---

**12.** The Act provides for federal assistance for the education of handicapped students in states opting to comply with the Act's requirements. 20 U.S.C. § 1421(a)(1). For a discussion of the federal-state relationship envisioned by the Act, *see Rowley,* —— U.S. at ——, 102 S.Ct. at 3037–38.