Susan CIRESOLI, individually and on behalf of her minor child, Joshua Ciresoli, Plaintiff,

v.

M.S.A.D. No. 22; Leo G. Martin, in his capacity as Commissioner of the Maine Dep't of Education; and Susan W. Davenport, in her capacity as Commissioner of the Maine Dep't of Mental Health and Mental Retardation, Defendants,

v.

John R. McKERNAN, in his capacity as Governor of the State of Maine; and Jane Sheehan, in her capacity as Commissioner of the Maine Dep't of Human Services,[1] Third–Party Defendants.

Civ. No. 94–0011–B.

United States District Court, D. Maine.

Sept. 6, 1995.

1. Per a stipulation of dismissal, Jane Sheehan, Commissioner of the Maine Department of Human Services is no longer a party to this action.

Judson Esty–Kendall, Pine Tree Legal Assistance, Inc., Bangor, Maine, for Plaintiff.

Eric R. Herlan, Drummond, Woodsum, Plimpton & MacMahon, Portland, Maine, for Defendant M.S.A.D. # 22.

Peter Stewart, Asst. Atty. Gen., Augusta, Maine, for Dept. Of Education.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Susan Ciresoli brings this action on behalf of her emotionally disturbed son, Joshua. She contends that Defendants Maine School Administrative District Number 22 ("M.S.A.D. # 22" or "the District") and the Maine Department of Education failed to provide Joshua with an appropriate education as required by the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1491o (the "IDEA"), and state law. Ms. Ciresoli and the District also bring claims against the State and various state agencies under the IDEA, the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 (the "ADA"), and the Rehabilitation Act, 29 U.S.C. §§ 701–797b.

The Court divided the case into two tracts: an administrative tract for reviewing the Hearing Officer's decision; and a standard tract for addressing the remaining claims under the IDEA, the ADA, and the Rehabilitation Act. The case is ready for decision, the parties having agreed to have this case decided on briefs and a stipulated record. The Court will first decide the administrative tract issues under the IDEA and state law.

### I. The Administrative Tract

The express goal of the IDEA, 20 U.S.C. §§ 1400–1491, is "to assure that all children with disabilities have available to them … a free appropriate public education." 20 U.S.C. § 1400(c). The IDEA, formerly known as the Education of the Handicapped Act, "provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir.1993) (citing 20 U.S.C. § 1412 and *Board of Educ. v. Rowley*, 458 U.S. 176, 179–80, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982)), *cert. denied*, —— U.S. ——, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994). One of these procedural requirements is the annual development of individualized education programs (IEPs) for each student with a disability. 20 U.S.C. § 1401(a)(18)(D).

A parent who disagrees with a school's proposed educational plan is entitled to an impartial due process hearing conducted by the State educational agency. 20 U.S.C. § 1415(b)(2). In addition, pursuant to 20 U.S.C. § 1415(e)(2), any party aggrieved by

the findings and decisions made during that hearing can bring a civil action in state or federal court with respect to the complaint presented at the hearing. Ms. Ciresoli pursues her appeal of the hearing officer's decision pursuant to § 1415(e)(2).

## A. Facts and Procedural Background

The facts, according to the stipulated record, are as follows: Joshua Ciresoli was six-and-a-half years old when this action was filed and is now eight years old. He is a child of average to above-average cognitive abilities. He has, however, exhibited difficult and unpredictable assaultive behavior since a very early age and has been diagnosed as having, among other problems, Childhood Psychotic Disorder. The parties agree that Joshua's difficulties make him eligible for services under the IDEA.

Joshua and his mother are residents of Hampden, Maine. Hampden is located within Maine School Administrative District Number 22 ("M.S.A.D. # 22" or "the District"). In the fall of 1992, Joshua began kindergarten at the McGraw School, which is located within M.S.A.D. # 22. Earlier caretakers expressed concern that Joshua's behavior would require a high level of intervention. In response, the District convened a pupil evaluation team to design an individualized education program (IEP) for Joshua, pursuant to the IDEA. Under that Program, Joshua was successfully mainstreamed in kindergarten with some special services including physical therapy, extra support from the teacher, and consultations with the special education teacher and the school psychologist. At the end of the 1992–93 academic year, Joshua appeared ready to be promoted to first grade during the 1993–94 academic year.

During summer vacation, however, Joshua exhibited a marked increase in unpredictable aggressive behavior including assaulting other children and taking a kitchen knife to bed. This behavior caused Ms. Ciresoli to fear for her own safety as well as that of Joshua's younger sister. In August 1993, she placed Joshua in Acadia Hospital, a psychiatric hospital located in Bangor, Maine. Although Joshua's stay at Acadia was intended to be a short one, Joshua remained at Acadia for almost seven months. In September, Joshua began attending the academic program within Acadia. This program, which provided approximately two hours per day of academic training, was financed by the District.

The District convened Joshua's pupil evaluation team in September 1993 to discuss Joshua's educational progress and his placement after discharge from Acadia. At that meeting, several members of the Acadia staff discussed Joshua's behavior at the hospital. They noted, in particular, Joshua's unpredictable assaultive actions and his repeated need for physical restraint. Joshua's treating psychiatrist recommended "[a] residential placement due to Joshua's potential for violence to others." (Ex. c at 19.) The District's Director of Special Education, Ruey Yehle, asserted that Joshua's need for a residential placement was for mental health reasons rather than educational reasons. (Id.) Although the team met again on October 13, 1993, they remained unable to come to a consensus on placement. In its October 13th IEP, the District proposed a nearby day program, known as the Old Town Regional Program, to be supplemented by: daily home-school coordination, individual counseling for one hour per week, social skills and group work for thirty minutes per week, a parent meeting for forty-five minutes per week, and psychological counseling twice a month for thirty minutes.

Unhappy with the District's proposed placement, Ms. Ciresoli requested a "due process" hearing. According to witnesses at that hearing, held on November 30 and December 1, 1993, Joshua remained at Acadia where his behavior had deteriorated since the October 13th IEP. His discharge from Acadia was not imminent. The Acadia staff who testified were unanimous in recommending residential placement after discharge. The District's psychologist, however, testified that the day program recommended by the District would be appropriate for Joshua after his discharge from Acadia.

The Hearing Officer found that Joshua's mental illness needs were different and segregable from his educational needs. She concluded that the District was not responsible for the cost of a residential placement

because Joshua was educable without such a placement. She further decided that the Old Town Regional Day Program could meet Joshua's educational needs with some cooperation from the hospital during the transition. Ms. Ciresoli disagrees and appeals the Hearing Officer's decision to this Court.

The Court allowed the parties to supplement the record with evidence about Joshua's condition and progress since the due process hearing. On March 1, 1994, almost three months after the administrative decision, Ms. Ciresoli removed Joshua from Acadia, against medical advice, because of a dispute with hospital staff over the lack of an adequate discharge plan. Joshua never attended the Old Town Regional Program, however, because Ms. Ciresoli preferred that he attend a tutoring program at the McGraw School for first grade. The McGraw School program began primarily as one-to-one instruction within the special education program and gradually included a recreational component. Joshua's behavior and performance in school were generally good during this time.

Also early in March, Ms. Ciresoli began to seek services from the Bureau of Children with Special Needs, an agency within the Maine Department of Mental Health and Mental Retardation, and from Community Health and Counseling, a private agency hired by the Bureau for the provision of mental health services. During the week of April 18, 1994, Community Health and Counseling began to provide a rehabilitation worker for ten hours per week. During spring vacation the next week, however, Joshua assaulted two peers and was admitted to the Jackson Brook Institute, another psychiatric hospital. Joshua remained at Jackson Brook until June 1994. During his institutionalization, Joshua received educational services for two hours per day through the Spurwink School, a private agency that provides academic services to Jackson Brook patients. The District paid for the services provided by Spurwink.

Joshua's psychiatric team at Jackson Brook recommended that "Joshua receive 44 hours of home based support services in addition to the estimated 30 hours per week of school programming which he will be receiving" after his discharge from the hospital. (Ex. r at 4.) Ms. Ciresoli contacted a number of agencies in an attempt to provide these services to Joshua. Through Ms. Ciresoli's determined efforts, Joshua was receiving twenty-four hours per week of rehabilitation services; fifteen hours per week of recreational coaching; and some psychological counseling shortly after his discharge from Jackson Brook. In addition to these services, Joshua also participated in a one-on-one summer school program, designed by his pupil evaluation team, from 8:30 AM to 2:30 PM, five days a week.

Joshua had a successful summer and his team recommended that, for the academic year 1994–95, he enter a full-day program at the McGraw School for second grade. Partially in response to a request by Ms. Ciresoli, this program included mainstream activities for 50–80% of the day. Joshua began second grade, as scheduled, in August. Despite the services he was receiving both in and out of school, Joshua's behavior began to deteriorate at the end of August, marked by threatening and assaultive behavior. After consulting with Joshua's psychiatrist, psychologist, and rehabilitation workers, Ms. Ciresoli decided to re-institutionalize Joshua at Jackson Brook in mid-September. While a patient, Joshua again attended the Spurwink School at the District's expense. In November, Joshua's treatment team at Jackson Brook noted that: "Within the hospital environment [Joshua's] behaviors appear stabilized[;] [h]owever, he continues to remain[ ] at serious risk for decompensation if these supports cannot somehow be duplicated in a less restrictive setting following discharge." (Ex. ff.) His team then recommended a therapeutic foster care setting or a residential treatment program.

Joshua was again discharged from Jackson Brook and again returned to the McGraw School in early December 1994. (Supp. Stip.Rec. ¶¶ 1, 3.) During the spring, Joshua received approximately twenty hours of recreational therapy and ten to fourteen hours of rehabilitation services in addition to his approximately thirty hours of school programming each week. These services were

provided and financed primarily by the Department of Mental Health and Mental Retardation and its contractees. (Supp.Stip.Rec. ¶¶ 4–6.) During the summer, Joshua's school programming was increased to forty hours per week and his outside services were decreased by about ten hours per week. (Supp.Stip.Rec. ¶¶ 3, 6.)

## B. Standard of Review

■■ Plaintiff has brought this action under the IDEA,[2] specifically 20 U.S.C. § 1415(e)(2), as a party aggrieved by the findings and decisions of the state educational agency. In actions brought under § 1415(e)(2), "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). This is, however, "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Rather, courts are required to give the state administrative proceedings "due weight." *Id.* To accomplish this, district courts should apply "an intermediate standard of review . . . —a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir.1993) (citations omitted).

■■ Although § 1415(e)(2) "contains no provision which specifically assigns the burden of proof to a particular party in the appeal of an agency decision . . . [a]s a general principle . . . in such appeals the burden of proof is on the party who seeks to overturn the findings and decision of the agency." *Burlington v. Department of Educ. for Mass.*, 736 F.2d 773, 794 (1st Cir.1984) (citations omitted), *aff'd*, 471 U.S. 359, 105 S.Ct.

1996, 85 L.Ed.2d 385 (1985). Accordingly, Plaintiff carries the burden of proof in this matter. Because the parties agree that the District complied with the procedural requirements of the IDEA, Plaintiff must show, by a preponderance of the evidence, that the individualized educational program provided to Joshua does not satisfy the IDEA.

■■ The IDEA requires school districts to provide disabled students with "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). "Implicit in the congressional purpose of providing 'a free appropriate education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." *Rowley*, 458 U.S. at 200, 102 S.Ct. at 3048. At the same time, however, the IDEA does not require school districts to provide services that would enable disabled children to achieve their full potential commensurate with the opportunity provided other children. *Id.*; *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir. 1983) (citations omitted). Rather, the program provided by the school need only be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

■ The IDEA also has mainstreaming criteria which require schools, "to the maximum extent appropriate," to educate disabled children "in the least restrictive environment with children who are not disabled." *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 50 (1st Cir.1992); *see also* 20 U.S.C. § 1412(5) and 34 C.F.R. § 300.550 (1994). The central question in this case, therefore, is whether the educational program provided to Joshua was reasonably calculated to enable him to receive some educational benefit in the least restrictive environment.

## C. Scope of Review

■ As a general matter, an IEP is ripe for judicial review when the state educational

**2.** Plaintiff also challenges the administrative decision based on state law. Maine's special education statutes and regulations largely mirror the

IDEA. For that reason, the Court does not separately analyze the state law challenge to the IEP.

agency has issued a final decision reviewing that proposed educational plan. *Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184, 190 (1st Cir.1993). A hearing officer for the State Department of Education issued a final decision regarding the IEP prepared by the District for the 1993–94 academic year. The dispute between the parties at that hearing was whether the District's proposal to educate Joshua in the Old Town Regional Day Program, rather than a residential placement as requested by his mother, was appropriate under the IDEA.

■■■ This case has been complicated, however, by the fact that Joshua's condition and the focus of the parties have changed significantly since the administrative decision. Although the District still defends its proposal to send Joshua to the Old Town program, it appears that the District would now prefer to keep Joshua at the McGraw School. Likewise, although Plaintiff still requests that the Court order the District "to locate and fund an appropriate residential placement," (Am.Compl. at 14), she would now prefer that the Court order the District to provide home-based support services, (Pl.'s Br. at 22).

The District argues that the Court should not reach the question of home-based support services because it was not presented at the administrative hearing. (Dist.'s Reply at 2 (citing *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 424 (1st Cir.1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986)); *see also Pihl*, 9 F.3d at 190 (in an IDEA case, failure to raise a claim at the administrative level bars the court from hearing that portion of the claim). Plaintiff responds, however, that such services were not seriously contemplated at the time of the hearing. (*See* Pl.'s Reply at 5.)

■■■ The Court notes, first, that the scope of judicial review in IDEA cases is "broader than the usual review of administrative decisions," because "[i]n addition to the administrative record, a court 'shall hear additional evidence at the request of a party' and 'shall grant such relief as the court determines is appropriate.'" *DeVries v. Spillane*, 853 F.2d 264, 266 (4th Cir.1988) (quoting 20 U.S.C. § 1415(e)(2)). Courts may con-

sider subsequent IEPs not yet appealed to a state agency as "additional evidence" useful in fashioning appropriate relief. *Burlington*, 736 F.2d at 794.

Indeed, some courts have actually considered the merits of subsequent IEPs not yet appealed in conjunction with the merits of those IEPs that were appealed. *See, e.g., DeVries*, 853 F.2d at 266–67 (court reviewed both 1987–88 IEP and 1986–87 IEP even though only 1986–87 IEP was appealed to administrative agency), and *Johnson v. Lancaster–Lebanon Intermediate Unit 13*, 757 F.Supp. 606, 614 (E.D.Pa.1991) (court reviewed both 1990–91 IEP and 1989–90 IEP even though only 1989–90 IEP was appealed to administrative agency). Such an approach is appropriate *"when the complaint remains the same though the IEPs change."* *DeVries*, 853 F.2d at 267 (emphasis added) (parent's demand that child be educated in his neighborhood school had not changed even though school's proposals had changed); *see also Johnson*, 757 F.Supp. at 614 n. 6 (considered "the similarity of the 1990–91 IEP to the 1989–90 IEP").

In this case, however, Plaintiff's demands have changed. In fact, Plaintiff did not even contemplate the issue of home-based services at the time of the administrative hearing. Plaintiff could have properly raised this issue in an administrative appeal of Joshua's 1994–95 IEP. Such an appeal could then have been consolidated with the original appeal to this Court. *Burlington*, 736 F.2d at 794. She did not. Under these circumstances, the Court holds that Plaintiff did not properly exhaust her administrative remedies as to the issue of home-based services.

■■■ The IDEA does not always require exhaustion, however. *Pihl*, 9 F.3d at 190 (citing, among others, *Honig v. Doe*, 484 U.S. 305, 311–12, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988)). "Exhaustion may not be required where the pursuit of administrative remedies would be futile or inadequate; waste resources, and work severe or irreparable harm on the litigant; or when the issues raised involve purely legal questions." *Pihl*, 9 F.3d at 190. This case falls into none of these exceptions. There is nothing in the

record to suggest that seeking an administrative remedy would be futile or inadequate. Further, requiring administrative review would not cause either Plaintiff or her son to suffer severe or irreparable harm. Joshua is currently receiving almost all of the services that Plaintiff requests at no charge. Finally, administrative review in this case would not waste valuable resources—quite the contrary. Deciding whether Joshua needs home-based support services under the IDEA is necessarily a largely fact-driven question. Although the stipulated record supplied by the parties contains some discussion of this issue, neither party has had an opportunity for the presentation and cross-examination of expert witnesses on this area. Because Plaintiff has failed to exhaust her administrative remedies and no exception to the exhaustion doctrine applies, the Court holds that the issue of home-based services is not properly before the Court at this time.

### D. Review of Joshua's 1993–94 IEP

■ The Court's review of the administrative decision will be limited, therefore, to deciding whether the 1993–94 IEP prepared by the District was reasonably calculated to enable Joshua to receive educational benefit. Ms. Ciresoli opposed the day program proposed by the District and preferred a residential placement.[3]

■ Courts have "ample authority under the Act" to order a school district to pay for "a suitable residential program upon finding that such a placement [is] essential" for the disabled child to make "*any* educational progress." *Abrahamson,* 701 F.2d at 227 (emphasis in original); *see also* 34 C.F.R. § 300.302 (1994) ("If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child."). On the other hand, "the Act does not authorize residential care merely to enhance *an otherwise sufficient* day program." *Abrahamson,* 701 F.2d at 227 (emphasis in original). "A handicapped child

who would make educational progress in a day program would not be entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential." *Id.* Rather, a district is required "merely to ensure that the child be placed in a program that provides opportunity for some educational progress." *Id.* In fact, "[p]lacing a child in a residential program when that is unnecessary for enabling the child to make educational progress may also violate the Act's mainstreaming provisions." *Id.* at 227 n. 7.

The central question, therefore, is whether the placement is essential in order for the disabled child to make educational progress. *Id.* at 227. This determination is necessarily fact and case specific. *Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 980 (4th Cir.1990).

The parties do not dispute that, at the time of the hearing, Joshua required hospitalization for psychiatric difficulties. The parties agree that this placement served medical rather than educational needs. Just a few months prior to his hospitalization, however, Joshua had been successfully mainstreamed into a regular kindergarten program. In addition, the Old Town program had successfully educated other children who suffered from disabilities similar to Joshua's. The program had a very low student-teacher ratio and program staff were trained in non-violent crisis intervention.

The events that followed the administrative decision also support the administrative findings. Although Joshua never matriculated at the Old Town program, the parties have stipulated that he received educational benefit from an even less restrictive placement. In fact, Plaintiff's request for residential placement is now made only secondarily to her request for home-based support services to supplement Joshua's day program.

The Court recognizes that Joshua's behavior, particularly outside the structure of his school programming, is often unpredictable and sometimes dangerous. This, by itself, is not enough to compel a residential placement

---

3. The Court notes that the question of residential placement is not moot because Ms. Ciresoli is still requesting such a placement, albeit second to her request for home-based services.

under the IDEA, as long as the student is receiving an educational benefit from his placement. *See. e.g., Hall v. Shawnee Mission Sch. Dist.*, 856 F.Supp. 1521, 1528–30 (D.Kan.1994) (residential placement not required for emotionally disturbed student whose behavior problems at home were severe but his academic progress at school was very good with only minor behavioral problems); *Swift v. Rapides Parish Public Sch. Sys.*, 812 F.Supp. 666 (W.D.La.1993) (despite fact that majority of psychologists and psychiatrists who evaluated student recommended residential facility and fact that student was dangerous and uncontrollable at home, residential placement not required where student received meaningful educational benefit in day program), *aff'd*, 12 F.3d 209 (5th Cir.1993) (table, No. 93–04300). The result would likely be different if the Court found that Joshua's "behavior eventually reached a point at which he was uncontrollable both in and outside of school, rendering him uneducable without extensive psychological treatment." *Manchester Sch. Dist. v. Charles M.F.*, Civ. No. 92–609–M, 1994 WL 485754, 1994 U.S. Dist. LEXIS 12919 (D.N.H. Aug. 31, 1994) (residential placement required under these circumstances). Fortunately, Joshua has not reached this point.

The Court is satisfied in this case that, when the District prepared the 1993–94 IEP, it could have reasonably anticipated that Joshua would receive educational benefit from the proposed day program rather than a residential program. Accordingly, the administrative decision is affirmed and judgment should be entered in favor of the District and Leo Martin in his capacity as Commissioner of the Department of Education on Count One.

## II. The Standard Tract

The cross-claims and third-party claims raised by the District against the State and various state agencies are basically claims for indemnification. Because the Court does not require the District to provide Joshua with

additional services at this time, those claims are dismissed without prejudice.

■ Plaintiff's claims under the ADA and the Rehabilitation Act, however, are not automatically dismissed. The IDEA was amended in 1986 to provide that "[n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under ... title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities...." 20 U.S.C. § 1415(f).

The IDEA does require, however, that "before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [administrative] procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under [the IDEA]." 20 U.S.C. § 1415(f).

The Court has already concluded that Plaintiff did not adequately exhaust her administrative remedies as to her claims for home-based services under the IDEA. In Counts Three, Four, and Five, she again seeks home-based services, this time under the ADA and the Rehabilitation Act. Because these claims request "relief that is also available under [the IDEA]," 20 U.S.C. § 1415(f), Plaintiff's failure to exhaust her administrative remedies is similarly fatal to these claims. *See Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089 (1st Cir. 1989) (dismissing claims under the Rehabilitation Act, and § 1983 for failure to exhaust administrative remedies under IDEA); and *Association for Community Living v. Romer*, 992 F.2d 1040 (10th Cir.1993) (dismissing claims under § 1983 against Governor and State Department of Education for failure to exhaust administrative remedies under IDEA). Accordingly, the Court orders that Counts Three, Four, and Five be dismissed.[4]

■ In Count Two of her Amended Complaint, Plaintiff claims that the Department of Education also violated the IDEA by failing to provide for the development and im-

---

4. The Court also notes that Plaintiff is now receiving most of the services she has requested through various state agencies at no charge. Ac-

cordingly, to a very large extent, Plaintiff's claims in Counts Three, Four, and Five are moot.

plementation of interagency agreements as required by 20 U.S.C. § 1413(a)(13). Although Plaintiff also did not exhaust her administrative remedies as to this claim, the Court is satisfied that exhaustion in this circumstance is not required. "Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek system[-]wide reforms." *Romer*, 992 F.2d at 1044 (citations omitted). Plaintiff's claim, that the Department of Education violated the IDEA by failing to implement interagency agreements, alleges a structural or systemic failure for which an administrative remedy would be inadequate. Accordingly, the Court will look to the merits of this claim.

■ The IDEA expressly provides that:

Any State meeting the eligibility requirements ... and desiring to participate in the program ... shall submit to the Secretary, through its State educational agency, a State plan ... [that] shall—

(13) set forth policies and procedures for developing and implementing interagency agreements between the State educational agency and other appropriate State and local agencies to—

(A) define the financial responsibility of each agency for providing children and youth with disabilities with free appropriate public education, and

(B) resolve interagency disputes, including procedures under which local educational agencies may initiate proceedings under the agreement in order to secure reimbursement from other agencies or otherwise implement the provisions of the agreement[.]

20 U.S.C. § 1413(a)(13).

According to the Stipulated Record, agencies in Maine cooperate to coordinate delivery of services to an individual child "primarily through discussions by representatives of ... agencies on an Interdepartmental Council." (Stip.Rec. ¶ 44.) This Interdepartmental Council convened a subcommittee to create a more formal system of coordination among those agencies. This subcommittee now consists of representatives from the Maine Departments of Education, Correc-

tions, Human Services, and Mental Health and Mental Retardation, as well as the Office of Substance Abuse and "is expected to meet periodically to discuss and develop comprehensive case management plans for certain children who receive services from more than one of the member agencies." (*Id.*)

Other than this arrangement, "there are no interagency agreements ... establishing procedures for resolving interagency disputes between [the various] agencies." (*Id.* ¶ 39.) Nor are there interagency agreements in place providing a mechanism through which an agency may "initiate proceedings to require other state agencies ... to provide services ... or secure reimbursement from those agencies for the cost of such services." (*Id.* ¶ 40.)

Although the State conceded the above facts, its brief did not address Plaintiff's claim that it has not adequately "set forth policies and procedures for developing and implementing interagency agreements." 20 U.S.C. § 1413(a)(13). It appears, from the Stipulated Record, that the State did not comply with the requirements of § 1413(a)(13). Although the State has developed an Interdepartmental Council and an informal procedure to discuss case-management plans, it has not developed any formal procedures to resolve interagency disputes or to allow school districts to secure reimbursement from other agencies. Nor has the State pointed to any policies or procedures for developing and implementing such interagency agreements. The Court concludes, therefore, that the State Department of Education has not complied with 20 U.S.C. § 1413(a)(13). Accordingly, the Court orders the Department to establish policies and procedures for developing and implementing interagency agreements in compliance with § 1413(a)(13).

### III. Conclusion

The Court orders that JUDGMENT on Count One of Plaintiff's Amended Complaint shall be entered for Defendants, M.S.A.D. #22 and Leo Martin, in his capacity as Commissioner of the Maine Department of Education. The Court orders that JUDGMENT on Count Two of the Amended Complaint shall be entered for Plaintiff as against

Defendant Leo Martin, in his capacity as Commissioner of the Maine Department of Education. Counts Three, Four, and Five of the Amended Complaint are hereby DISMISSED. The District's Cross–Claims and Third–Party Claims are also DISMISSED.

*SO ORDERED.*