Jane DOE, et al., Plaintiffs,

v.

**ARLINGTON COUNTY SCHOOL BOARD, et al., Defendants.**

No. Civ.A. 98–0371–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 18, 1999.

Mary Ann Kelly, The Law Office of Mary Ann Kelly, Falls Church, VA, Jodi Therese Tuer, McDonald and Karl, Washington, DC, for Jane Doe, John Doe, June Doe, plaintiffs.

John F. Cafferky, Hunton & Williams, McLean, VA, for Arlington County School Board, Alvin Crawley, defendants.

*MEMORANDUM OPINION*

HILTON, Chief Judge.

This case came before the Court on summary judgment motions filed by the parties. The Court has previously ruled that no facts are in dispute and this case should be decided on the administrative record.

Jane Doe was born on April 28, 1988, and is now 10 years old. During the 1996–97 and 1997–98 school years at issue, she attended Arlington Traditional School ("ATS"), for second and third grades, respectively.

She was first found eligible for special education while in kindergarten. She was in second grade during the time of the administrative proceedings.

For the years at issue, Jane Doe was identified as a disabled student on the basis of Mental Retardation. In addition, her attention deficit hyperactivity disorder ("ADHD") so significantly impacted her education that it was considered an additional disability.

The primary consequences of Jane Doe's disabilities are significant cognitive and adaptive behavior deficits that place her far below the levels of her age and grade peers. Psychological evaluations have determined her full-scale IQ to be between 45 and 59, primarily within the moderately-mentally retarded range. Her level of adaptive functioning (in areas such as communication and daily living skills) is also far below her age and grade peers, and comparable to her cognitive deficits. As to academics, when she was nearly nine years old, her functioning in basic academic areas was more consistent with the functioning of a child of approximately 4½ to 5½ years of age.

The issue has always concerned the student's placement. The goals, objectives, and content of the student's Individualized Education Programs ("IEPs") have never seriously been in dispute. At the time of the March 1997 administrative hearing, Jane Doe received the majority of her academic instruction (reading, math, language, arts, etc.) in a special education "resource" classroom at ATS taught primarily by Lynn O'Grady. She attended a regular, second grade classroom, with her non-disabled peers, taught by Cynthia Margeson, for some academic instruction and morning routine. She would participate in music, lunch, physical education, recess, assemblies and field trips with her non-disabled second grade classmates. She also received speech/language therapy, and occupational therapy.

For the 1997–98 school year, she received core academic instruction in ATS'

Cognitive Disabilities program, later renamed the "PACE" program. The PACE classroom was small, 4–5 students with cognitive profiles similar to that of the student, and was taught by a certified special education teacher with a Masters Degree. It provided intensive, direct instruction in Jane Doe's weakest academic areas. She also participated in a regular education third-grade class for all non-academic activities (which comprise over one-third of the week), as well as 30 minutes per week each in social studies and science, with Rex Godwin, her regular education third-grade teacher.

At the initial March 11, 1997 administrative hearing, the parents elected not to introduce any live testimony, but rather to rely on the 200–plus documents that they had submitted. To expedite the proceedings, the parties agreed that the school system would present its witnesses' testimony by way of written statements from the student's teachers and other school staff.

Although several issues were decided, the hearing officer found that the school system's self-contained program for academic subjects, with mainstreaming for other subjects and activities, as recommended by Dr. Alvin Crawley and other school staff, would provide a least restrictive appropriate environment within which to implement the student's IEP. He also rejected the parents' allegations of discrimination, finding no evidence that ACPS officials discriminated against Jane Doe making it difficult for her to receive FAPE [free appropriate public education].

The parents appealed the hearing officer's decision to a reviewing officer, Arthur M. Baugh. In a June 9, 1997 hearing, the parents elected to call live witnesses (including teachers and school staff). They offered extensive testimony regarding the proposed program for the upcoming 1997–98 school year, under an updated April 9, 1997 IEP. After hearing the additional testimony, the reviewing officer affirmed all aspects of the hearing officer's decision.

He specifically endorsed the appropriateness of the April 1997 IEP and proposed placement in the self-contained PACE classroom for academic instruction, and regular education instruction for all other subjects and activities. He ruled that when one considers both the facts and the law, it is clear that the student is receiving the least restrictive appropriate environment for implementation of Jane Doe's latest IEP (October 22, 1996). At the time of this review hearing there was a new IEP, April 9, 1997, and the evidence at the June 9, 1997 hearing affirms that the IEP also is appropriate for the student for 97/98. In fact it was based on, and substantially unchanged from the IEP in which the parent's expert witness Dr. Sprouse participated and which the parents refer to as the "Sprouse IEP."

Both administrative decisions contained extensive findings of fact, which were fully supported by detailed references to specific exhibits and witness statements or testimony.

The plaintiffs in Count I seek to reverse the administrative decisions regarding the appropriateness of the proposed placements at issue. Plaintiffs contend, among other things, that the hearing officers improperly weighed the evidence, and wrongly concluded that the student was educated with her non-disabled peers to "the maximum extent appropriate" under IDEA. Plaintiffs further assert that the same alleged "denial of a free appropriate public education in the least restrictive environment" under IDEA amounts to "discrimination" prohibited by § 504, entitling them to money damages and a jury trial.

Plaintiffs in Count II seek reversal of the reviewing officer's decision on the specific ground that the reviewing officer somehow improperly approved the updated April 9, 1997 IEP formulated after the original hearing, but prior to the review hearing.

Count III seeks money damages under § 1983 for the alleged statutory violations in Count I.

In Count IV, the plaintiffs continue to claim that they were denied access to the student's educational records during the administrative proceedings.

■ This Court is required to give great deference to the findings of the administrative hearing officers. *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998); *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991). Where, as here, the decisions of the Local and State Hearing Officers are in accord, "even greater deference is due." *Combs v. School Bd. of Rockingham County,* 15 F.3d 357, 361 (4th Cir.1994).

■ Equally important in reviewing the record is that "[L]ocal educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." *Hartmann,* 118 F.3d at 1001; *see also Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 663 (4th Cir.1998).

■ To "give meaning" to these principles, the Court must strictly limit the admission of any "additional evidence" beyond that contained in the Administrative Record. *Springer,* 134 F.3d at 666–67. To do otherwise would "reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial *de novo.*" *Id.,* at 667.

■ It is also well settled in this Circuit that the plaintiffs here, as the parties "seeking to overturn a decision by a state hearing officer ... properly bear the burden of proof in showing that the [administrative] decision was erroneous." *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.), *cert. denied,* 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991) (citing *Spielberg by Spielberg v. Henrico County Pub. Sch.*, 853 F.2d 256 n. 2 (4th Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989)).

Plaintiffs' IDEA claim theorizes that the student's 1996–97 and 1997–98 placements were inconsistent with the IDEA's requirement that disabled students be educated "to the maximum extent appropriate" with non-disabled classmates. The hearing and reviewing officers both rejected this claim, and the record firmly supports their decisions.

The plaintiffs have agreed many times that the October 1996 IEP for the 1996–97 year, and the April 1997 IEP for the 1997–98 school year both contain appropriate goals, objectives and plans of instruction to enable the student to obtain educational benefits.

Therefore, the only issue is whether the student's placement during the 1996–97 and 1997–98 school years was the least restrictive appropriate placement for her under IDEA. *See* 20 U.S.C. § 1412(5)(B) (Supp.1996).

Throughout these proceedings, the plaintiffs have argued that education of a cognitively disabled student in anything other than a regular classroom setting for all subjects is illegal. However, the Fourth Circuit recently stressed in *Hartmann,* "the IDEA's mainstreaming provision establishes a presumption, not an inflexible mandate. Under its terms, disabled children are to be educated with children who are not handicapped only 'to the maximum extent appropriate.' ... Section 1412(5)(B) explicitly states that mainstreaming is not appropriate 'when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.'" *Hartmann,* 118 F.3d at 1001 (emphasis added).

The Supreme Court has recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children. *Rowley*, 458 U.S. at 181 n. 4, 102 S.Ct. 3034.

■ Thus, the "proper inquiry" in every mainstreaming case is "whether a proposed placement is appropriate under the Act." *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir.1989); *Hartmann*, 118 F.3d at 1002 (Mainstreaming is "ultimately a goal subordinate to the requirement that disabled children receive educational benefit."). The Court in *Hartmann* reaffirmed the applicable criteria for evaluating mainstreaming cases.

■ Mainstreaming is not required where (1) the disabled child would not receive an educational benefit from mainstreaming into a regular class; (2) any marginal benefit from mainstreaming would be significantly outweighed by benefits which could feasibly be obtained only in separate instructional setting; or (3) the disabled child is a disruptive force in a regular classroom setting. *Hartmann*, 118 F.3d at 1001. If the evidence supports any one of these factors, "mainstreaming" is not proper.

In *Hartmann*, the school system had proposed a self-contained special education class for a nine-year old autistic student. Like the student's program here, the program in *Hartmann* included mainstreaming in regular education activities for lunch, art, music, library, physical education, and recess. The parents, however, like the parents here, demanded a "full inclusion" program in a regular third-grade class. The Fourth Circuit, according proper deference to the school system's judgments, affirmed the two administrative decisions finding the proposed program appropriate for the child. In upholding Fairfax County's decision not to place Michael DeVries in Annandale High School, the Court observed not only that Michael would derive virtually no academic benefit from the regular classroom, but

also that his work would be at a much lower level than his classmates and that he would in effect "simply be monitoring classes." *DeVries*, 882 F.2d at 879. Here the hearing officer made an identical finding, concluding that Mark "did not participate in the regular curriculum, but was provided his own curriculum." Mark's special education teacher in Loudoun County explained, "Mark needs a completely different program.... His skills have to be taught in a different way, in a different sequence, and even a different group of skills ... from what his typical functioning peers are learning."

■ The evidence firmly supports both hearing officers' determination that the "full inclusion" program promoted by the plaintiffs would not meet the student's educational needs for core academic subjects, given her significant cognitive limitations and distractibility. Their approval of the school system's self-contained special education program for the student's core academic instruction (math, language arts, writing, etc.), with participation in the regular classroom for all other courses and activities, is likewise amply supported by the record.

All of the school system educators who have participated in the student's IEP explained in detail why she cannot benefit from a regular class placement for her basic academics. As the hearing officers correctly noted, even several of the parents' private evaluators agreed. For example, Dr. Pearl, the neurologist retained by the parents, stated early on that he recommended that she receive a self-contained classroom setting for the academic subjects, and in particular for language arts and math. Likewise, the parents' private speech/language evaluator stated the student would benefit from a learning environment that has a small teacher student ratio.

Plaintiff was clearly unable to benefit from the regular education second and third-grade curriculum. Academically, she was many years behind her age and grade

peers. While her regular education second-grade classmates were reading and writing about multi-chapter books, the student was still struggling to learn the sounds associated with letters, and to learn a few basic sight words. Likewise, in math, when other students were performing complex addition, subtraction, multiplication and division, she knew only the first few math facts, such as $1+1$. When given the regular education class work, she would simply copy the second term in the equation as the answer. On the regular education writing assignments, many she could not even begin, while on others, she would similarly copy down random letters.

Accordingly, it was the uniform opinion of the school staff that the student needed different work, not modified regular assignments. The student's instructional needs dictate a curriculum which is fundamentally different both in pace and content, from the regular curriculum.

Additionally, her teachers found that providing the plaintiff with a modified or specialized curriculum in the regular education setting simply would not work, because she refused to perform work different from that of the regular education students.

Moreover, as the hearing and reviewing officers found, a regular education mainstream classroom of two-dozen students was too distracting for the student to learn, given her significant attentional deficits and distractibility. The student's distractibility in the large, regular education setting continued to present significant problems during the 1997–98 school year.

The placement proposed, and later implemented by the school system at ATS (the PACE program) gave the student the opportunity to learn her core academic subjects in a non-distracting environment, while receiving the intensive support of a trained special education teacher and aide, and a curriculum geared specifically for her level of disability.

As Dr. Crawley explained, for students like Jane Doe, "direct instruction, repetition, the drill, the pacing, all of those are essential in terms of making progress."

The student made substantial educational progress in her placement during the 1996–97 school year. Ms. O'Grady stated that it was the special education setting in which she observed the most progress for the student. At the hearing, she explained that she was previously a nonreader. "She couldn't identify alphabet letters. She can now give us most of the beginning sounds in words. . . . She at one point couldn't even match objects to a number, and now we've moved pretty much beyond that, and the parents have worked a lot with her at home on homework to go along with what we're doing in school, where she can do simple addition. So this is a lot of progress for the student."

Even the student's mother agreed that she made progress while working with Ms. O'Grady.

For the 1997–98 school year, Dr. Crawley explained that the PACE classroom offered even more advantages than the special education instruction she received during the 1996–97 school year, given its specific focus on students with disabilities like Jane Doe's, and the elimination of the distraction posed by instruction in different rooms with different teachers.

The most compelling proof of whether an educational program was appropriate is whether the student, indeed, made progress in that program. Here, everyone, including the parents themselves, agree that the student did make tangible educational progress while receiving core academic instruction in the PACE classroom for the 1997–98 school year. The student also benefited from the time she spent with her non-disabled peers in music, art, recess, assemblies, and other activities.

The parents' repeated contention that the school system could have appropriately educated the student in the regular classroom for all subjects by providing her with

a personal aide or special education teacher to assist her in class, is simply unsupported. The hearing and reviewing officers both rejected that contention. The school staff fully considered the parents' idea, but explained in great detail why it would not work. As Ms. O'Grady testified:

"special ed teacher could take that IEP and go in that classroom.... That would mean that Jane Doe would work in a group of one with the special ed teacher, I assume over on another table, and my concern is twofold. The student's distractibility and her attention deficit. She would hear two adults talking at the same time. She'd be looking at what the other kids were doing, and I believe she would have difficulty focusing on what she was asked to do. My other concern about the core areas is the need of very direct instruction, and my opinion is that in language arts and math, those very important areas, she needs to be taught. She doesn't need to be in the regular classroom drawing a picture of George Washington while the other kids are reading and writing questions that go along with it."

Her regular education teacher echoed these concerns. She explained that an aide cannot eliminate the activity and distraction which results from having 22 other students in a class. The aide also can neither do the learning for her nor bridge the gap in cognitive levels between the student and the other students in the class.

Given the evidence, and the professional judgment of school staff, that providing core academic instruction in the regular classroom would not be appropriate for Jane Doe, the school system was not obliged to reject an effective plan, and experiment with an ill-advised "full inclusion" plan, as the plaintiffs seem to theorize.

The plaintiffs' additional contention that the school system has "failed and refused to provide in the regular classrooms the supplemental services and modifications to which Jane Doe is entitled by law" is also untrue. In fact, the student's teachers attempted every manner of adaptations and accommodations to try to provide modified academic instruction in the regular education environment, but they were not successful. The unsuccessful attempts to provide modified course work for the student in the regular education class have been described in detail. Ms. Mageson also attempted a wide variety of other adaptations and accommodations in the regular classroom. She provided more individual assistance to the plaintiff than to any other student in her class, and more time outside of class to addressing issues for her than for any other student. The IDEA "does not require regular education instructors to devote all or most of their time to one handicapped child ..." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir.1989); *D.F. v. Western Sch. Corp.*, 921 F.Supp. 559, 571 n. 3 (S.D.Ind. 1996).

As discussed above, the school staff provided knowledgeable and detailed explanation of precisely why the "full inclusion" program advocated by the parents was not appropriate for the student, and why a self-contained special education setting for academic classes was necessary. By contrast, the parents' original educational consultant, Dr. Sprouse, relied primarily upon general theories and philosophies. She could not identify the concrete details of how a "full inclusion" program would work, such as whether or when the student would be assisted in the regular class by a special education teacher, a parent volunteer, or someone else. The parents' newfound experts, Dr. Bruns and Ms. Giles, similarly lacked any concrete details.

In Sum, the evidence firmly supports the hearing officers' findings that the "full inclusion" program advocated by the parents was not appropriate. The well-informed testimony of the school staff solidly established that the self-contained placement for academics met the applicable "mainstreaming" criteria under the *Hartmann* standard: The student either could

"not receive an educational benefit from mainstreaming into a regular class" for her core academics, or "any marginal benefit from mainstreaming would be significantly outweighed by benefits which could feasibly be obtained only in a separate instructional setting." 118 F.3d at 1001.

The plaintiffs attempt to raise two new matters that were not raised before the hearing officers below. The first is an argument that the school system somehow violated the IDEA's "stay put" requirement (20 U.S.C. § 1415(e)(3) [now § 1415(j) ]), by not providing all of the student's instruction in a "mainstream" environment as supposedly required by a June 1996. The second argument is that two memos written in 1993 by several former school administrators (who were never involved in Jane Doe's specific placement decisions), discussing general concerns at that time, somehow show that Jane Doe's placement three to five years later was inappropriate.

■ Because this "stay put" argument was never raised in the administrative hearings, plaintiffs are precluded from raising it now. *See, e.g., Leonard v. McKenzie*, 869 F.2d 1558, 1563 (D.C.Cir. 1989) (" 'Courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objections made at the time appropriate under its practice' ") (citation omitted); *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 424 (1st Cir.1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986) ("for issues to be preserved for judicial review they must first be presented to the administrative hearing officer."); *Bruschini v. Board of Educ. of the Arlington Cent. Sch. Dist.*, 911 F.Supp. 104, 107–08 (S.D.N.Y.1995) (same).

In any event, the school staff involved in that IEP explained that it was all parties' understanding that the June, 1996 IEP was not intended to be a "full inclusion" IEP, but rather, was to offer flexibility in the amount of time that the student could spend in either a special education or regular education classroom. It is also inconceivable that the parents could really believe that the June, 1996 IEP was a "full inclusion" IEP, given their admission that the student's educational program prior to that IEP provided special education instruction outside of the regular classroom.

As to the second issue, the 1993 memos was an issue not raised below. The memos written years before the time periods at issue reveal that they say nothing about the student, as even the plaintiffs admit. Plainly, they are not relevant here. Plaintiffs have no facts to suggest that these general memos were connected to placement decisions about Jane Doe three, four and five years later. Moreover, to the extent that it was necessary to consider the issue further, the authors themselves explained in detail that these memos were merely opinions advocating even greater improvements within the school system.

Plaintiffs' § 504 claim is derivative of their IDEA claim. In ¶ 27 of the complaint, they allege that the student has been "discriminated" against because she has allegedly been "denied the benefits of a free appropriate public education in the least restrictive environment solely by reason of handicap of plaintiff Jane Doe." The gist of the claim is precisely the same as the plaintiffs' IDEA claim that the student was supposedly denied an appropriate education.

■ The law is clear that to the extent plaintiffs want to assert such claims under § 504, they must first exhaust all administrative procedures under IDEA. *See* 20 U.S.C. § 1415(f), *Charlie F. v. Board of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991 (7th Cir.1996) (exhaustion required on § 504 claim, even though money damages not available under IDEA); *Waterman v. Marquette–Alger Intermediate Sch. Dist.*, 739 F.Supp. 361, 365 (W.D.Mich.1990) (same). As with IDEA claims, the exhaustion rule also bars consideration of claims under § 504 not raised below. *E.g., How-*

ell by Howell v. Waterford Pub. Schools, 731 F.Supp. 1314, 1316 (E.D.Mich.1990) (dismissing § 504 claims as waived, and stating that "only allegations of plaintiffs' amended complaint which have been administratively exhausted" may be pursued) (emphasis in original); *Ciresoli v. Maine Sch. Admin. Dist. No. 22*, 901 F.Supp. 378, 387 (D.Me.1995) (barring special education related claims under § 504 and ADA which were not presented in the administrative hearings below).

■ An issue raised in the initial due process hearing, but not argued and briefed on appeal, is deemed waived. *Moubry v. Independent Sch. Dist. 696*, 9 F.Supp.2d 1086, 1099 (D.Minn.1998) (dismissing claim not argued in review proceedings, and observing that a number of courts have refused consideration of "challenges to an HO's [Hearing Officer's] decision on an issue, when that challenge was not presented, on appeal, to the appropriate HRO [Hearing Review Officer].") (citing cases). This is precisely what occurred with the parents' § 504 "discrimination" claim here.

Plaintiffs raised a "discrimination" issue in the initial administrative hearing. The hearing officer rejected it as without any evidence support. On appeal, however, the parents did not raise the issue. The statement of issues submitted by plaintiffs' counsel on appeal did not mention the § 504 "discrimination" claim at all. Neither did his follow-up fax identifying another issue. Still further, after the review hearing, the plaintiffs' 28–page brief does not argue the "discrimination" issue now urged in plaintiffs' lawsuit. Having failed to preserve this "discrimination" claim below, the plaintiffs here, like those in *Moubry*, are not permitted to resuscitate it in this Court now.

■ Even if the § 504 claim had not been waived, because it is based upon the allegation that the student was deprived of a free appropriate education, dismissal of the IDEA claim would require dismissal of the parallel § 504 claim as well. It is well-settled that in such cases, where the IDEA claims are subject to dismissal the § 504 claims based upon the same allegations, must also be dismissed. *E.g., Jones v. Washington County Bd. of Educ.*, 15 F.Supp.2d 783, 787 (D.Md.1998) ("because [plaintiffs'] IDEA claim failed, their Rehabilitation Act claim also fails"); *D.F.*, 921 F.Supp. at 573–74 (Dismissal of IDEA claim necessarily required dismissal of § 504 claim that student was "unlawfully excluded from the general education program at his neighborhood school."); *Moubry*, 9 F.Supp.2d at 1112; *Monticello Sch. Dist. No. 25 v. Illinois State Bd. of Educ.*, 910 F.Supp. 446, 449–50 (C.D.Ill.1995). *aff'd*, 102 F.3d 895 (7th Cir.1996); *see also Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir.1996) (summary judgment on IDEA claims bars § 504 and other statutory claims based upon alleged inappropriate educational program).

■ In the special education context, the standard of proving a § 504 claim is extraordinarily high. The plaintiffs must first demonstrate that "they have either been 'subjected to discrimination' or excluded from a program or denied benefits 'solely by reason of' their disability." *Sellers v. School Bd. of City of Manassas, Va.*, 141 F.3d 524, 528 (4th Cir.), *cert. denied*, —— U.S. ——, · 119 S.Ct. 168, 142 L.Ed.2d 137 (1998). Thus, if the alleged discrimination was motivated by factors other than the disability, even if the disability was, in part, a motivating factor, no claim under § 504 lies. *E.g., Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993) ("The word solely provides the key: the discrimination must result from the handicap and the handicap alone.").

Second, they must establish that the School Board's educational decisions relating to the student were so inappropriate as to constitute "either bad faith or gross misjudgment." *Sellers* 141 F.3d at 529. This follows from this Court's prior hold-

ing that " § 504 does not create any general tort of educational malpractice." *Barnett v. Fairfax County Sch. Bd.*, 721 F.Supp. 755, 757 (E.D.Va.1989), *aff'd*, 927 F.2d 146 (4th Cir.), *cert. denied*, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991).

The "bad faith or gross misjudgment" standard is extremely difficult to meet, especially given the great deference to which local school officials' educational judgments are entitled. Something far more than a mere denial of free appropriate education is required. Thus, in dismissing the plaintiffs' § 504 claim, the Fourth Circuit, in *Sellers*, followed the Eighth Circuit's decision in *Monahan v. Nebraska*, 687 F.2d 1164 (8th Cir.1982), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983) holding that: The reference in the Rehabilitation Act to "discrimination" must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [IDEA], is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap. 141 F.3d at 529 (quoting *Monahan*, 687 F.2d at 1170). Likewise, in *Moubry*, the Court dismissed the plaintiffs' § 504 claim, and observed, in language equally applicable here: "No amount of claimed violation of the Federal regulations will relieve the plaintiff from his burden to show bad faith or gross misjudgment. Upon a review of the administrative findings in their totality, it would be legally untenable to conclude that, in providing for the plaintiff's education, in a manner that fully complies with the IDEA, the district officials nevertheless, acted in bad faith, or with gross misjudg-

ment, without wholly vitiating the results of our Judgment on the Record." *Moubry*, 9 F.Supp.2d at 1111. The Court in *Monahan* further explained that, so long as the educational officials "have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504." 687 F.2d at 1171.

■ There is no evidence of bad faith or gross misjudgment in this case. Not only did the hearing officers affirm the school system's placement decision, but they also found a complete absence of any evidence of improper "discrimination" against the student. The hearing officer even cited to substantial evidence of "nondiscriminatory bent" on the part of school officials. Perhaps most telling of all, even the plaintiffs' own paid educational experts in this case both conceded that the school system's actions in no way rose to the level of "bad faith or gross misjudgment".

The plaintiffs also lack any evidence that the School Board acted "intentionally" to discriminate against the student. *E.g., Marvin H. v. Austin Indep. Sch. Dist.*, 714 F.2d 1348, 1357 (5th Cir.1983); *Sellers*, 960 F.Supp. at 1006, 1010, (E.D.Va.1997), *aff'd*, 141 F.3d 524 (4th Cir.). *cert. denied* —— U.S. ——, 119 S.Ct. 168, 142 L.Ed.2d 137 (1998). Rather, even the student's mother concedes that no school system member "intentionally" tried to do harm to Jane Doe: "I don't believe that they set out to cause her physical, emotional or educational harm."

The record is devoid of any evidence of "bad faith or gross misjudgment." The § 504 claim must be dismissed.

■ Count II simply alleges that the reviewing officer should be reversed because he supposedly had no authority to address the April 1997 IEP, as that IEP was not in existence at the time of the initial hearing decision from Judge Max-

son. This contention is without merit. The applicable special education regulations clearly state that during any review hearing, the reviewing officer has the right to accept and hear "additional evidence, if necessary. If a hearing is held to receive additional evidence, then all hearing rights as specified in this section apply." 8 Va.Admin.Code § 20–80–70(A)(11)(a)(3). Even under the Fourth Circuit's strict interpretation of "additional evidence" under IDEA, "additional evidence" includes relevant, "supplemental" information. *Springer*, 134 F.3d at 667. The State Review Officer, thus, clearly had discretion to consider supplemental matters such as the April 9, 1997 IEP that had been formulated after the conclusion of the prior "due process" hearing.

Moreover, in this case, at the June 9, 1997 review hearing, the plaintiffs themselves requested the right to submit additional evidence, and live testimony after having elected to present none in the prior hearing. The April 9, 1997 IEP was presented and accepted as an exhibit at the hearing before State Review Officer Baugh, without any objection by the parents, or their counsel. Parents' counsel even agreed with the State Review Officer's clarification that the earlier, October 22, 1996 IEP was not longer at issue, in light of the more recent April 9, 1997 IEP. Having agreed that the April 9, 1997 IEP was properly under consideration by the reviewing officer, the plaintiffs cannot now contend that it was error for the hearing officer to consider that IEP. In any event, consideration of the April 1997 IEP (as opposed to the October 1996 IEP) made no substantive difference, as both plaintiffs' counsel and the expert witness, agreed that the two IEPs are "basically the same".

██ The plaintiffs' § 1983 claim also fails because they cannot establish that any of the alleged deprivations they claim were pursuant to an official "policy or custom" of the School Board. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690–91, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Brubaker v. City of Richmond*, 943 F.2d 1363, 1379 (4th Cir.1991).

The plaintiffs have no proof that the alleged denial of an appropriate education for the student resulted from an official "policy or custom" of the School Board. Indeed, the evidence shows the School Board's policy is to adhere completely to "least restrictive environment" provisions of the IDEA, and the reviewing officer so found.

The plaintiffs claim that they were somehow "denied access to the student's educational records." Both hearing officers rejected these claims. The hearing officer devoted nearly five, single-spaced pages to explaining the parents' contentions in this regard. The reviewing officer found that the "evidence in this case is abundantly clear that the appellants have been able to review all of the records."

The complaint seems to take issue with the fact that the plaintiffs were not permitted to photocopy certain copyrighted test protocols contained in the student's "confidential" file. The reviewing officer correctly found that, "copyright restrictions preclude them from being copied and given to the [parents]." At the hearing, the protocols were made available for the plaintiffs' review, but they never bothered to look at them. Because these documents were made available, the plaintiffs' attorney conceded that the issue "was moot." In fact, he stated on the record that the parents' claim about non-access to records was "all speculation," and that "there's not going to be any proof on it." The same documents were again made available at the review hearing, at which time they were reviewed by Mrs. Doe. Plaintiffs cannot seriously claim denial of access to records.

For the foregoing reasons, summary judgment should be GRANTED in favor of the defendants.